1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ----------------------------------------------------------X
     KAREN A. WALD,
3
                                        PLAINTIFF,
4

5             -against-              Case No.:
                                     17-cv-03560
6

7    THE DEPARTMENT OF EDUCATION, OF THE CITY OF NEW YORK, and
     THE CITY SCHOOL DISTRICT OF THE BOARD OF EDUCATION OF
8    THE CITY OF NEW YORK,

9                                       DEFENDANTS.
     ----------------------------------------------------------X
10

11

12                                DATE:   February 1, 2018

13                                TIME:   10:27 A.M.

14

15

16              DEPOSITION of the Plaintiff, KAREN A. WALD,

17    taken by the Defendant, pursuant to an Order and to the

18    Federal Rules of Civil Procedure, held at the New York City

19    Law Department, 100 Church Street, 4th floor, New York, New

20    York 10007, before Danielle Kaastra, a Notary Public of the

21    State of New York.

22

23

24

25

```
1    A P P E A R A N C E S:

2

3    STEWART LEE KARLIN LAW GROUP, P.C.
             Attorneys for the Plaintiff
4            KAREN WALD
             111 John Street, 22nd floor
5            New York, New York 10038
             BY: NATALIA KAPITONOVA, ESQ.
6

7
     ZACHARY W. CARTER, ESQ.
8    CORPORATION COUNSEL
     NEW YORK CITY LAW DEPARTMENT
9            Attorneys for the Defendant
             THE DEPARTMENT OF EDUCATION
10           OF THE CITY OF NEW YORK, and
             THE CITY SCHOOL DISTRICT OF
11           THE BOARD OF EDUCATION OF
             THE CITY OF NEW YORK
12           100 Church Street
             New York, New York 10007
13           BY:  JUSTIN REITER, ESQ.
             File #:  2017-026672
14           Control #:  168674

15

16                    *          *          *

17

18

19

20

21

22

23

24

25
```

```
 1            F E D E R A L   S T I P U L A T I O N S

 2

 3

 4            IT IS HEREBY STIPULATED AND AGREED by and between

 5     the counsel for the respective parties herein that the

 6     sealing, filing and certification of the within deposition

 7     be waived; that the original of the deposition may be

 8     signed and sworn to by the witness before anyone authorized

 9     to administer an oath, with the same effect as if signed

10     before a Judge of the Court; that an unsigned copy of the

11     deposition may be used with the same force and effect as if

12     signed by the witness, 30 days after service of the

13     original & 1 copy of same upon counsel for the witness.

14

15            IT IS FURTHER STIPULATED AND AGREED that all

16     objections except as to form, are reserved to the time of

17     trial.

18

19                      *      *      *      *

20

21

22

23

24

25
```

K.  WALD

1    K A R E N   A.    W A L D, called as a witness, having been

2    first duly sworn by a Notary Public of the State of New

3    York, was examined and testified as follows:

4    EXAMINATION BY

5    MR. REITER:

6        Q.    Please state your name for the record.

7        A.    Karen Wald.

8        Q.    What is your address?

9        A.    201 East 17th Street, New York, New York 10003.

10                    MR.  REITER:   Please mark this exhibit.

11                ( Whereupon,  complaint  was  marked  as

12                Defendant's Exhibit A for identification as of

13                this date by the Reporter.)

14       Q.    Good morning, Ms. Wald.   My name is Justin

15   Reiter.   I represent corporation counsel with the New York

16   City Law department and I'm the attorney for the Department

17   of Education in the lawsuit which you have commenced.   I'm

18   here to conduct your deposition regarding the lawsuit and

19   which is currently pending in the United States District

20   Court in the Easter District of New York.

21                Now I'm going to be asking you a series of

22   questions relating to the allegations in your complaint and

23   in this lawsuit.   Before I begin my questions I just want

24   to go over a few ground rules that we have before every

25   deposition that we take to make this process easier for

K. WALD

1    everyone.   Now your testimony is being transcribed by the

2    court reporter.   You must answer my questions verbally and

3    keep your voice up so that the court reporter can record

4    your responses.   The court reporter cannot record a nod of

5    the the head or shaking of the head so each and every

6    response must be verbal.   Do you understand.

7         A.    Yes.

8         Q.    Now you've been placed under oath by the court

9    reporter and this is the same oath that you would take if

10   you were testifying at a trial before a judge and a jury.

11   It requires that you answer my questions fully and as

12   accurately as you can and if you answer falsely that is

13   considered perjury.   Do you understand?

14        A.    Yes.

15        Q.    Do you understand the difference between the

16   truth and a lie?

17        A.    Yes.

18        Q.    Please listen to my questions and wait until I

19   finish asking a question before responding.   The court

20   reporter cannot record two people talking at once,

21   therefore, you need to let me finish my question before you

22   begin your answer.   Do you understand this instruction?

23        A.    Yes.

24        Q.    If you do not understand a question, please let

25   me know and I will clarify the question or I can rephrase

6

K. WALD

1    it so you do understand.  If you do not ask me to clarify

2    or rephrase the question, I will assume that you have

3    understood the question.  Do you understand that

4    instruction?

5         A.    Yes.

6         Q.    A copy of the transcript of today's deposition

7    will be provided to you at some time after this deposition

8    for your review and signature for its accuracy.  Do you

9    understand?

10        A.    Yes.

11        Q.    If you need to take a break at any point during

12   the deposition, please let me know; that's completely fine.

13   The only thing I would ask is that if we are in the middle

14   of a series of questions, that we finish the series before

15   we take that break.  Do you understand?

16        A.    Yes.

17        Q.    Do you have any questions for me before we begin

18   this deposition?

19        A.    No.

20        Q.    Now I'm just going to have to ask you some

21   questions that we have to ask everyone prior to each and

22   every deposition.  Okay?

23        A.    Yes.

24        Q.    Are you aware of any reason that might impair or

25   prevent you from truthfully answering my questions here

K.  WALD

1    today?

2        A.      No.

3        Q.      Do you suffer from any condition, either mental

4    or physical that might impair your ability to understand my

5    questions?

6        A.      No.   Not that I know of.

7        Q.      Have you ever been diagnosed with any psychiatric

8    or psychological condition which may impact your ability to

9    testify today?

10       A.      No.

11       Q.      Have you taken any medications, prescription or

12   otherwise in the last 24 hours?

13       A.      Yes.

14       Q.      What medication is that?

15       A.      Acyclovir.

16       Q.      Can you spell that for the record?

17       A.      A-C-Y-C-L-O-V-I-R.   Ibrutinib, I-B-R-I-T-I-N-U-D

18   (sic), Bactrim -- I think it's called ferrous sulfate;

19   they're iron pills, vitamin C, vitamin D.

20       Q.      Any other medications?

21       A.      No.

22       Q.      What was the first medication?

23       A.      Acyclovir.

24       Q.      What's that medication?

25       A.      Anti-viral.

K. WALD

1    Q.    How often do you take the medication?

2    A.    Twice a day.

3    Q.    And what does that medication do for you?

4    A.    It's a prophylactic.  In other words, I have a --

5    it strengthens my resistance to infection, viral infection.

6    Q.    Do you believe that this medication will inhibit

7    your ability to understand my questions, remember events

8    accurately and testify truthfully?  Do you want me to

9    rephrase the question?

10   A.    Yes.

11   Q.    Do you believe that that medication will inhibit

12   your ability to answer my questions truthfully?

13   A.    No.

14   Q.    The second medication?

15   A.    Bactrim.

16   Q.    Can you explain what that medication is for?

17   A.    An antibiotic.

18   Q.    How often do you take Bactrim?

19   A.    Every other day.

20   Q.    Do you believe that that medication will inhibit

21   your ability to answer my questions truthfully?

22   A.    No.

23   Q.    The next medication?

24   A.    Ibrutinib.

25   Q.    What does Ibrutinib do for you?

K. WALD

1    A.    It's chemotherapy.

2    Q.    How long have you been taking this particular

3    medication for?

4    A.    Two and a half years.

5    Q.    And how often do you take this?

6    A.    Every day.

7    Q.    And this is a chemotherapy pill you said?

8    A.    Yes.

9    Q.    Do you believe that this medication will inhibit

10   your ability to understand my questions and testify

11   truthfully here today?

12   A.    No.

13   Q.    Were you supposed to take any medications,

14   prescription or otherwise, in the last 24 hours that you

15   have not taken?

16   A.    No.

17   Q.    Have you taken any controlled substances or

18   consumed any alcoholic beverages in the past 24 hours?

19   A.    The ibrutinib is a controlled substance.

20   Q.    Aside from ibrutinib?

21   A.    No.

22   Q.    Now did you review any document in preparation

23   for today's deposition?

24   A.    Yes.

25   Q.    What documents?

K.  WALD

1      A.      An e-mail or two that I had.

2      Q.      Were those e-mails that you reviewed produced to

3  my office during the course of the litigation?

4      A.      I don't know.

5              MR. REITER:   If those e-mails were not

6  produced we're going to call for the production of the

7  e-mails that she is referring to.

8      A.      I assume that I sent them to the attorney.

9      Q.      Those e-mails you had reviewed you had sent to

10  your attorney previous to November?

11      A.      Yes.

12      Q.      When did you review those documents?

13      A.      Yesterday.

14      Q.      Was anyone there when you reviewed those

15  documents?

16      A.      No.

17      Q.      The documents you reviewed, did they refresh your

18  recollection as to the events you allege in this lawsuit?

19      A.      Somewhat.

20      Q.      What were those e-mails about?

21      A.      They were to the union official who negotiated

22  with the OEO who was then trying negotiating with the New

23  York Department of Medical Division.

24      Q.      Was that e-mail you sent to the OEO or was it

25  sent to the union?

K. WALD

1    A.    No.  I sent it to the union.  The union sent it

2    to the OEO and the OEO sent it to -- had a discussion with

3    the medical division of the DOE.

4              MR. REITER:  I don't believe we have a

5    copy.

6    A.    It was just the follow-up.  I haven't heard from

7    them.

8    Q.    Okay.

9    A.    There was no -- it was just follow-up.

10   Q.    And what was the date of this e-mail?

11   A.    There were I think in September and in October of

12   2015.

13   Q.    And who was the union official that you sent this

14   e-mail to?

15   A.    Tom Bennett.

16   Q.    Did Tom Bennett respond to you?

17   A.    Yes.

18   Q.    What did he say to you?

19   A.    I think he called me or I think he called.

20   Q.    What did he say to you when he called you?

21   A.    At one time he said he couldn't find the OEO

22   person, William Brewton.  He said he was working on it.

23   Then, I think in September he told me to apply for a

24   medical hardship, which I did and then something got

25   confusing.  I don't correctly remember what happened with

K. WALD

1    the medical hardship and then I asked him to follow up

2    because I hadn't gotten a decision in a long time.

3         Q.    So this was in September of 2015?

4         A.    September and early October.

5         Q.    There were two e-mails that you reviewed in

6    preparation for today.  Was there any other documents that

7    you reviewed?

8         A.    There was a letter that was sent to you for the

9    case.  The reasons that I filed the case.

10        Q.    The complaint?

11        A.    Yes.

12        Q.    Okay.  So the complaint and the e-mail that you

13   sent to Tom Bennett?

14        A.    Yes.

15              MR. REITER:  We'll call for the

16   production of those documents since we have not received

17   those.

18              MS. KAPITONOVA:  You mean the e-mails

19              because the complaint you have.

20              MR. REITER:  Just the e-mails we're going to

21              call for the production of.

22        Q.    Are there any other e-mails that you sent to the

23   OEO office yourself in regard to the medical accomodation

24   request that you submitted in or around August 26, 2015?

25        A.    As far as I recall I don't think I ever sent an

K.  WALD

1    e-mail to the OEO.

2        Q.      Did you ever send an e-mail to the Department of

3    Education, anyone at the Department of Education regarding

4    you medical hardship request or medical accomodation

5    request?

6        A.      No.   I sent it to my union rep.

7        Q.      Who was your union rep?

8        A.      Patty Crispino.

9        Q.      When did you send the e-mail to Crispino?

10       A.      Probably in the end of August early September.

11               MR.  REITER:   Were going to call for the

12   production of the e-mails to Patty Crispino.

13       A.      I don't know I have an e-mail with Patty.   I

14   talked to her every day.   I don't know if I can find an

15   e-mail about that.

16       Q.      So you're saying there are no e-mails to Patty

17   Crispino but you spoke to her on the phone in regard to the

18   medical accomodation request?

19       A.      Yes.

20               MR.  REITER:   To the extent that the

21   e-mails exist, we would call for production.   If they don't

22   exist, of course they can't be turned over.

23               MS.  KAPITONOVA:   Sure.

24       Q.      Aside from reviewing documents, did you do

25   anything else to prepare for this deposition?

K. WALD

1    A.    I don't know what you mean.

2    Q.    Not talking about the conversation with your

3    attorney but did you speak to anyone at all in regard to

4    this lawsuit prior to appearing today?

5    A.    Maybe Patty Crispino.

6    Q.    When did you speak to Patty Crispino?

7    A.    I speak to her often.  I was a union chapter

8    leader.  It might have come up.

9    Q.    Have you spoken to Patty Crispino recently?

10   A.    Yes.

11   Q.    What did you say to Patty Crispino?

12   A.    Usually she asks me how I am or sometimes she'll

13   ask me a question.  I was the chapter leader and she'll ask

14   me a question if she has a question for the chapter leader.

15   Q.    When was your most recent conversation with Patty

16   Crispino?

17   A.    Yesterday or the day before.

18   Q.    Did you speak to Patty Crispino about this

19   lawsuit yesterday or the day before?

20   A.    No.  Not in detail, no.

21   Q.    Now did you discuss the fact that you were

22   appearing for this deposition with anyone other than your

23   attorney?

24   A.    I may have mentioned it to Patty.  I'm not quite

25   sure.

K. WALD

1     Q.      Anyone else?

2     A.      No.

3     Q.      All right.  Have you ever been known by any other

4   name other than Karen Wald?

5     A.      No.

6     Q.      What was your date of birth?

7     A.      10/31/1949.

8     Q.      Where were you born?

9     A.      In the Bronx.

10    Q.      How long have you lived at your current home

11  address?

12    A.      Over 35 years.

13    Q.      Are you married?

14    A.      No.

15    Q.      Have you ever been married previously?

16    A.      No.

17    Q.      What is the highest level of education that you

18  have achieved?

19    A.      Partial PhD.

20    Q.      Where did you receive your partial PhD from?

21    A.      Seton Hall.

22    Q.      When did you receive that?

23    A.      I didn't complete it.

24    Q.      So you didn't complete it; you started the

25  partial PhD.  So you didn't receive a degree from Seton

K. WALD

```
 1    Hall?

 2         A.    No.

 3         Q.    What other degrees do you have?

 4         A.    I have a BA, an MA and an MBA.

 5         Q.    Where is your BA from?

 6         A.    University of Michigan.

 7         Q.    What did you receive your BA in?

 8         A.    American History.

 9         Q.    When did you graduate?

10         A.    '71.

11         Q.    The other degree that you have?

12         A.    An MA.

13         Q.    Okay.

14         A.    From Columbia.

15         Q.    What was that for?

16         A.    Curriculum design.

17         Q.    When did you receive that degree?

18         A.    '73 or '74.

19         Q.    And you also mentioned another?

20         A.    An MBA.

21         Q.    Where did receive your MBA?

22         A.    Baruch.

23         Q.    When?

24         A.    '91 or '92.

25         Q.    So just let me finish my question, please.
```

K.  WALD

1       A.      I'm sorry.

2       Q.      When did you receive your degree from Baruch

3   College?

4       A.      '91 or '92.

5       Q.      After high school are there any other schools

6   that you attended?

7       A.      For degrees.

8       Q.      Yes?

9       A.      No.

10      Q.      Do you hold any profession licenses or

11  certificates?

12      A.      Yes.

13      Q.      What professional licenses or certificates do you

14  hold?

15      A.      I have a teacher's license.

16      Q.      And since when?  How long have you had your

17  teacher's license for?

18      A.      Maybe since '74.

19      Q.      Any other?

20      A.      Various licenses, various teacher's licenses.

21      Q.      So let's break those down.  What licenses do you

22  have?

23      A.      I had, in the early days, I had a bilingual

24  French; bilingual Spanish, common branch, then I had BE

25  adult basic education.

K. WALD

1      Q.      Do you still hold all of these licenses?

2      A.      The bilingual licenses expired.

3      Q.      Do you still hold the common branch license?

4      A.      The common branch was changed to adult basic

5    education.

6      Q.      When did your common branch licenses change to

7    adult basic education license?

8      A.      I don't remember the date.

9      Q.      How long have you had an adult basic education

10   license to the best of your knowledge?

11     A.      Well it was when they added the adult basic

12   education is when an ESL license that got converted to

13   adult basic education license.

14     Q.      Why was it converted from an ESL license to an

15   adult basic education license?

16     A.      There was a problem with the State with teacher's

17   teaching ESL who didn't have master's in ESL.  So the

18   program converted many of the teacher's who were teaching

19   ESL to BE teacher's.

20     Q.      So you were converted to the basic ed license

21   because you did have a master's license?

22     A.      In ESL.

23     Q.      You didn't have a master's license in ESL, which

24   can you just state for the record what ESL stands for?

25     A.      English as a second language.

K. WALD

1    Q.    So that was the reason why you converted the line

2    of duty to basic ed?

3    A.    That was the reason why it was converted.

4    Q.    Now are you currently employed?

5    A.    No.

6    Q.    What was the last job that you held?

7    A.    At OACE.

8    Q.    And when was that?

9    A.    I was officially employed until January 31st,

10   2016.

11   Q.    So that was the last day that you were employed

12   by the board of education?

13   A.    Yes.

14   Q.    What was your job title at the time that you

15   retired on January 31, 2016?

16   A.    Adult basic education Teacher and I was the

17   chapter leader.  Well no, I wasn't the chapter leader at

18   the last month.  I was an adult basic ed teacher.

19   Q.    So at the time you retired on January 31, 2016,

20   you were an adult basic ed with the office of Adult

21   Continuing Education?

22   A.    Correct.

23   Q.    How long prior to your requirement had you been

24   employed as an adult basic education teacher to the best of

25   your knowledge?

K.  WALD

1       A.      Maybe from 2006.   Can you repeat the question?

2    Adult basic ed you said?

3       Q.      Yes.

4       A.      So adult basic ed was maybe 2006.   Around 2006,

5    2007.

6       Q.      Between 2006 and 2007 until you retired on

7    January 31, 2016, you were working as an adult basic ed

8    teacher?

9       A.      More or less.   I don't remember the exact dates

10   but that sounds pretty close.

11      Q.      Can you explain to me what the job

12   responsibilities were as an adult basic ed Teacher?

13      A.      Depending on the level of the class, we taught

14   reading, writing, math, science, history, basically

15   building the skills that the students should have or should

16   learn to receive a high school diploma.

17      Q.      What were the ages of the students that you

18   taught?

19      A.      21 upward.

20      Q.      So anyone 21 and up could be a part of the class?

21      A.      Correct.

22      Q.      You testified that your responsibilities change

23   on the level of the class.   Are you just stating based on

24   the quality of the students of the class or what did you

25   mean by that statement?

K. WALD

1      A.      The responsibilities change based on the quality

2    of the education of the student, on the level of the

3    student.   They are grouped in knowledge based skills but

4    even in a level two or a level three there is a wide

5    variety.

6      Q.      What was your position with the Department of

7    Education prior to becoming an adult basic education

8    teacher?

9      A.      I taught ESL.

10     Q.      What grade level did you teach ESL?

11     A.      The same thing.

12     Q.      Adult Education?

13     A.      Yes.   From 2001 to 2006 or 2007 I taught ESL.

14   There was a one year hiatus where I went back to the day

15   school.

16     Q.      What was the day school?

17     A.      K-12.

18     Q.      What year was that?

19     A.      I'm pretty sure it was 2006, 2007 but I would

20   have to check for you.

21     Q.      Other than that one year you were teaching

22   English as a second language for adults?

23     A.      Right.   And then I taught many years before that.

24     Q.      Where did you teach many years before that?

25     A.      I taught common branch bilingual Spanish.

K.  WALD

1     Q.     In day school?

2     A.     In day school.

3     Q.     What years were you teaching in day school?

4     A.     I think I started in '72 or '73.  I worked for

5     three years and then left for a long time.  Then I don't

6     remember, maybe either '80 or early 90's I worked

7     part-time.  It was broken.

8     Q.     So you left the Department of Education for a

9     period of time in the 70's through the 80's; is that

10    correct?

11    A.     Yes.

12    Q.     What were you doing during that time period?

13    A.     I went back to school.  I worked in sales.

14    Q.     So how many years in total have you been employed

15    by the New York City Department of Education?

16    A.     25 years.

17    Q.     And have you always worked with the office of

18    Adult Continuing Education throughout your employment with

19    the New York City Department of Education?

20    A.     No.

21    Q.     Sometimes you were working in the day school when

22    you were not employed by the office of Adult Continuing

23    Education?

24    A.     Correct.

25    Q.     I'm going to show you what has been premarked as

K. WALD

1    Defendant's Exhibit A.  This is a copy.  Ms. Wald, do you

2    recognize this document?  Take your time to look at it.

3        A.      It looks familiar.  I can't attest to the dates

4    but yes.  The first page of the document.  Let me look

5    through the whole thing.

6        Q.      Yes.  Just to make sure you recognize it.

7        A.      Yes.

8        Q.      Is this the complaint that was filed in this

9    lawsuit?

10       A.      Yes.

11       Q.      Now Ms. Wald, why are you bringing this lawsuit

12   against the Department of Education here?

13       A.      Because I have a disability and I believe that I

14   was entitled to accomodation so I won't get sicker.

15       Q.      Now in the complaint you're alleging that you are

16   bringing this action pursuant to the Americans with

17   Disabilities Act; is that correct?

18       A.      Yes.

19       Q.      What disability do you have?

20       A.      I have leukemia.

21       Q.      When were you first diagnosed with leukemia?

22       A.      In 2013.

23       Q.      When did you first inform the Department of

24   Education that you had been diagnosed with leukemia?

25       A.      In August of 2015.

K.  WALD

1     Q.     So you informed the Department of Education that

2   you had leukemia when you submitted the medical

3   accomodation request form?

4     A.     That's correct.

5     Q.     Now how does your leukemia affect your everyday

6   life?

7     A.     Well before I was taking the chemotherapy I was

8   getting sick.  Well for a while it was worsening slowly and

9   then it got very bad in the year 2015.  Winter, fall 2014,

10   2015.

11    Q.     So fall 2014 is when the condition worsened; is

12   that correct?

13    A.     Yes.  It started in 2015.

14    Q.     In the fall?

15    A.     Yes.  It started worsening.

16    Q.     I'm sorry.  I thought you said fall.

17    A.     I did.

18    Q.     Fall 2014.  Did it start worsening when you

19   started chemotherapy or prior to that?

20    A.     No.  Prior to that.

21    Q.     When did you start undergoing chemotherapy?

22    A.     August 2015.

23    Q.     Now the from the date you were diagnosed with

24   leukemia in 2013 until you retired in 2016, did you have to

25   take any time off from work due to your diagnosis?

K. WALD

1    A.    Okay.  There was an issue with time off.  I was a

2    chapter leader.  Yes, I did take time off.

3    Q.    When did you take time off?

4    A.    I can't remember the dates but there was a time.

5    I was rarely sick but in Winter of 2015, okay, I was very

6    sick.

7    Q.    Did you take any time off from 2013 when you were

8    diagnosed with leukemia until December of 2015?

9    A.    What do you mean time off?

10    Q.    Did just you take any medical leave?

11    A.    No.

12    Q.    Okay.  The first time that you took medical leave

13    in relation to your leukemia was in December of 2015?

14    A.    I didn't take any medical leave.

15    Q.    What did you take?

16    A.    I took terminal leave.

17    Q.    So you didn't take medical leave, you took

18    terminal leave?

19    A.    Yes.

20    Q.    Did you ever take any medical leave in regard to

21    the leukemia?

22    A.    No.

23    Q.    So the only leave that you took in regard to your

24    leukemia was the terminal leave you took in December of

25    2015?

K. WALD

1      A.      Correct.

2      Q.      Did leukemia ever prevent you from working with

3   the Department of Education?

4      A.      What do you mean?

5      Q.      Were you ever physically unable to work because

6   of your leukemia?

7      A.      Yes.

8      Q.      Okay.   When were you physically unable to work?

9      A.      I was susceptible to viruses, okay.   I had

10   several respiratory infections in the fall and winter of

11   2015 and spring.

12      Q.      And spring of?

13      A.      2015.   Prior to taking the chemotherapy I was

14   getting several respiratory infections.

15      Q.      So in the spring of 2015 and the fall of 2014?

16      A.      '14.

17      Q.      So you started having respiratory infections in

18   the fall of 2014 and it continued into the spring of 2015?

19      A.      Yes.

20      Q.      Did you take time off from work in regard to

21   these respiratory infections?

22      A.      What do you mean time off?

23      Q.      Did you miss work?   Did you not appear to work

24   due to your infections?

25      A.      Yes.

K.  WALD

1     Q.     When did you take time off from work due to your

2   respiratory infections?

3     A.     I think at one time I took three days off.  Which

4   is quite unusual and out of character for me.

5     Q.     So the only time you took off in regard to your

6   respiratory infections was the three days off?

7     A.     Right.  I wasn't going to take any days off.

8     Q.     And that was in spring 2015?

9     A.     I took three days off.  That might have been on

10   more than one occasion.

11     Q.     So you're saying you took three days off on

12   multiple occasions?

13     A.     I don't know multiple but it might have been more

14   than once.

15     Q.     To the best of your knowledge how many days off

16   in total did you miss due to respiratory infections?

17     A.     I don't know.  Maybe nine or so.  There was a

18   policy in our program, okay.  I was chapter leader.  That

19   if you were absent more than ten days you can get U rating.

20     Q.     So there was a policy in the Adult Education

21   program?

22     A.     Yes.

23     Q.     The policy said that if you missed more than ten

24   days during the year that you could get an unsatisfactory

25   rating?

K.  WALD

1      A.      Correct.  It was a big issue as the chapter

2   leader.  And I was the chapter leader.

3      Q.      Did you miss ten days?

4      A.      I made sure that I didn't miss ten days.

5      Q.      So what was your rating from the 2014 school

6   year?

7      A.      It was satisfactory.

8      Q.      So you didn't receive an unsatisfactory rating?

9      A.      I wasn't absent more than ten days.

10      Q.      Okay, now when you took time off during the 2014

11   school year, did you inform the board of education of why

12   you were taking time off, the reason why you were taking

13   time off?

14      A.      You needed to have a letter.  So I'm pretty sure

15   I submitted a letter.

16      Q.      Who did you have a letter from?

17      A.      From a doctor.

18      Q.      Stating that you were physically unable to work?

19      A.      Yes.

20      Q.      Did the letter state that you were physically

21   unable to work?

22      A.      Yes.

23      Q.      Did the letter state why you were physically

24   unable to work?

25      A.      I don't recall.

K. WALD

1      Q.      Is your leukemia currently preventing you from

2  working?

3      A.      What do you mean?

4      Q.      Are you physically unable to work currently?

5      A.      I guess it would depend on what is the work.

6      Q.      What do you mean?  What would it depend on?

7      A.      On the conditions of the work and the rigor of

8  the work.

9      Q.      Since you retired in January of 2016, have you

10  applied for any positions for employment?

11     A.      A few.

12     Q.      Where have you applied to work?

13     A.      In Touro College in Brooklyn.  There is a BE

14  program there.

15     Q.      What is the BE program?

16     A.      The same thing I was teaching.

17     Q.      Basic ed?

18     A.      Basic ed.

19     Q.      And that's for adults?

20     A.      Yes.

21     Q.      Touro College in Brooklyn you said?

22     A.      Yes.  Presently I applied.

23     Q.      When did you apply?

24     A.      Last week.  A teacher who was working there asked

25  if I could replace her.

K. WALD

1    Q.    How many days of work would that job be?

2    A.    I'm not sure yet.

3    Q.    Have you heard back in regards to your

4    application?

5    A.    No.  Not yet.  She's leaving at the end of the

6    month I think.

7    Q.    You don't know the actual terms and conditions of

8    what this employment would be?

9    A.    Correct.

10   Q.    Have you applied anywhere else?

11   A.    I'm in CUNY.

12   Q.    You applied for a position with CUNY?

13   A.    Yes.  I'm listed looking for work with CUNY on

14   their website.

15   Q.    When you say you're listed as looking for work,

16   what does that mean?

17   A.    You go online and put in your area of

18   specialization and if they have your position they notify

19   you.

20   Q.    When did you put your name on this CUNY list as

21   looking for work?

22   A.    Two or three years ago.

23   Q.    Have you ever heard back in regards to your

24   application on the CUNY website?

25   A.    No.

K. WALD

1      Q.      Have you ever followed up with CUNY in regards to
2    any positions that were available?
3      A.      I know some teacher's that teach there in other
4    areas.
5      Q.      And have you spoken to those teacher's?
6      A.      It's a small program.
7      Q.      Adult education at CUNY?
8      A.      Yes.
9      Q.      Have you applied for any other positions other
10   than with CUNY and Touro College?
11     A.      There was going to be a position in District.
12   There used to be positions in DC37 but they closed the BE
13   program.
14     Q.      Positions with DC37 is that the union?
15     A.      Yes.
16     Q.      There was an Adult Education program within the
17   union?
18     A.      They had part-time and that was closed.
19     Q.      When was that closed?
20     A.      That closed I think last year.
21     Q.      So when did you apply for a position?
22     A.      I didn't apply because they closed it.  I don't
23   know of any other positions, areas where they teach BE.
24     Q.      So other than applying for a position with CUNY
25   and applying for a position with Touro College, have you

K. WALD

1    applied for any job at all?

2        A.      The College of New Rochelle asked me if I could

3    teach Spanish.

4        Q.      The College of New Rochelle?   Where is the

5    College of New Rochelle?

6        A.      In Brooklyn.

7        Q.      When did they ask you to teach Spanish?

8        A.      They asked me if I could teach Spanish on

9    Saturdays in the summertime.

10       Q.      When did they ask you if you could teach Spanish

11   on Saturdays in the summertime?

12       A.      Maybe in June.   I'm not sure.   But I don't work

13   Saturdays.

14       Q.      June of 2017?

15       A.      No.   June of 2016.

16       Q.      So about five months after you had retired from

17   the Department of Education?

18       A.      Yes.

19       Q.      Did you apply for a job with The College of New

20   Rochelle?

21       A.      Many years ago.   They found my resume and asked

22   me but I don't work on Saturdays.

23       Q.      So you declined the position?

24       A.      Correct.

25       Q.      Anywhere else?   Are there any other jobs that you

K.  WALD

1    applied for other than the job with Touro, CUNY and The

2    College of New Rochelle?

3         A.      I donated books to the International Rescue

4    Mission this past summer and they asked me if I want to

5    teach in the summertime.

6         Q.      I'm sorry.   You said that was the?

7         A.      International Rescue Mission.

8         Q.      The International Rescue Mission asked you if you

9    wanted to teach?

10        A.      In the summertime.

11        Q.      When did they make this offer?

12        A.      I was there they made me the offer, right?   They

13   asked me if I would be interested teaching in the

14   summertime.

15        Q.      This was the summer of 2017?

16        A.      Yes.

17        Q.      And did you decline the offer?

18        A.      I didn't want to work in the summertime.

19        Q.      Are there any other jobs you applied for?

20        A.      No.

21        Q.      If you were offered a position with Touro

22   College, would you be physically able to perform in the

23   job?

24        A.      I have to talk to the supervisor, ask her where

25   it is and the time and if I have to be there at 7:00 in the

K.  WALD

1    morning, and there is no break until 6:00 o'clock at night.

2    I don't know.   It depends on the job and the position.

3        Q.     So in order to determine whether or not you could

4    accept the job it would depend on the hours that you were

5    offered and the terms and conditions of the job itself?

6        A.     I don't understand the question.

7        Q.     I can rephrase.

8        A.     Okay.

9        Q.     You won't be able to determine whether you can

10   physically perform at the job until you find out more about

11   the job; is that correct?

12       A.     That's correct.

13       Q.     And CUNY you have not heard back from?

14       A.     Correct.

15              MR. REITER:   Let's take a break.

16              MS. KAPITONOVA:   Sure.

17              (Whereupon, a brief recess was taken.)

18       A.     I'd like to say something.   Did I tell you that

19   DC 37 school program was closed?

20       Q.     Yes.

21              MS. KAPITONOVA:   Back on the record.

22       A.     And why I don't work on Saturdays is because of

23   religious observance.

24       Q.     You don't work on Saturdays because of religious

25   observances?

K. WALD

1      A.      Yes.

2      Q.      What religion?

3      A.      I'm Jewish.

4              MR. REITER:   Please mark this exhibit.

5              (Whereupon, accomodation request was marked

6              as Defendant's Exhibit B for identification as of

7              this date by the Reporter.)

8      Q.      Showing you what's been marked as Defendant's

9  Exhibit B. Now do you recognize this document?

10     A.      Yes.

11     Q.      Now what is this document?

12     A.      Accomodation request form.

13     Q.      Can you please turn to the bottom of the page,

14  where it says signature of the applicant?

15     A.      Yes.

16     Q.      Is that your signature?

17     A.      Yes.

18     Q.      So this is the accomodation request form that you

19  submitted on August 26, 2016; is that correct?

20     A.      Correct.

21     Q.      You previously stated this is the first medical

22  accomodation request that you've made since you started

23  working with the Department of Education?

24     A.      Correct.  I was out on disability once because I

25  broke my foot in the school.

36

K. WALD

1    Q.    When were you out because you broke your foot, to

2  the best of your knowledge?

3    A.    I don't know.  2002, 2003.

4    Q.    Did you submit an accomodation request form like

5  this for your broken foot?

6    A.    No.  I was out on disability.

7    Q.    So you were out on disability when you broke your

8  foot?

9    A.    Yes.

10   Q.    Have you ever made any other medical accomodation

11 request with the Department of Education?

12   A.    No.

13   Q.    So this form states on the bottom it was received

14 by the Department of Education on September 3, 2015; is

15 that correct?

16   A.    That's what it says.

17   Q.    So it says it was received by the Department of

18 Education on September 3rd, 2015; is that correct?

19   A.    Yes.

20   Q.    When was the first day of school for the 2015,

21 2016 school year?

22   A.    I don't recall.

23   Q.    Do you remember the month when the 2015-2016

24 school year would have started?

25   A.    Prior the program started at the end of August

K. WALD

1    but I think it starts right after Labor Day.

2        Q.     Was this accomodation request, submitted on

3    August 26, 2015, submitted prior to the start of the 2016

4    school year?

5        A.     I believe so.

6        Q.     Now where did you work during the 2015-2016

7    school year?

8        A.     On 35 Street and 8th Avenue.

9        Q.     What was the name of that school?

10       A.     OACE Region 4.

11       Q.     Is that the only school that you worked at during

12   the 2015-2016 school year?

13       A.     Yes.

14       Q.     Now do you see where the section where it states

15   disability limitation and job functions unable to perform?

16       A.     Yes.

17       Q.     So did you fill out this section?

18       A.     I don't remember if I did or the PA did.

19       Q.     This section states that you have chronic

20   lymphocytic leukemia, decreased work as patient is fatigued

21   and at a high risk for infection with stressed schedule; is

22   that correct?

23       A.     Correct.

24       Q.     Do you see the detailed description of the

25   accomodation request section?

K. WALD

1       A.      Yes.  I signed it.

2       Q.      Now in this detailed description of accomodation

3   request you state, reduced travel time with the position

4   closer to her home or job hours more conducive with

5   adequate rest/decreased stress will prevent absences at

6   work and will allow for M.D. visits in her free time; is

7   that correct?

8       A.      Correct.

9       Q.      So is it fair to say that you were requesting

10  less work hours in this accomodation request?

11      A.      No.

12      Q.      Why not?

13      A.      Because I didn't want fewer work hours; I just

14  wanted a more consolidated space or time so I could rest in

15  between.

16      Q.      So what did you mean when you said job hours more

17  conducive to adequate rest/decreased stress?

18      A.      So my program was split, okay.  So that I have to

19  work a far distance, leave early in morning, get home, have

20  a little time to rest and then work four nights a week.  So

21  I wanted a schedule where I would have to either travel

22  less or work more hours in one place so I wouldn't be

23  running around all the time.

24      Q.      Is it possible that this could be construed as

25  meaning less hours because you requested job hours more

K.  WALD

1    conducive to adequate rest?

2                    MS. KAPITONOVA:   Objection to form.   You can

3                    answer.   If you can understand that question you

4                    can answer.

5        A.    I don't know how someone else can construe it.

6        Q.    So you were not requesting to work less hours?

7        A.    No.   I wasn't requesting to work fewer hours, and

8    the negotiations afterwards -- the people negotiating for

9    me were also told that I didn't want fewer hours.

10       Q.    You said the people negotiating for you.   Who are

11   you referring to?

12       A.    It was the union and Brewton.

13       Q.    Who from the union are you referring to?

14       A.    Tom Bennet.

15       Q.    What did Tom Bennett say on your behalf?

16       A.    I don't know.   I wasn't privy to the conversation

17   but I told him that I didn't want fewer hours.   I wanted a

18   schedule where I would be less susceptible to travel all

19   over the place and not all the time.   And I was taking

20   anti-virals and all the chemotherapy and if your riding the

21   trains for an hour each way and then late at night, I was

22   more susceptible.   Given the prior year, respiratory

23   infections on an ongoing basis, I was scared.

24       Q.    Do you have any e-mails from Tom Bennet to

25   Mr. Brewton regarding your accomodation request?

K.  WALD

1      A.      He didn't tell me what the nature of the

2   conversation was.   He told me he could accommodate, that

3   Mr. Brewton would do this or Mr. Brewton would do that.

4   Mr. Brewton agreed on the accomodation.   The medical DNE

5   could not get Ms. Mills to agree.   That was the nature of

6   the e-mails.

7      Q.      The nature of the e-mails between?

8      A.      That I received.

9      Q.      Who were these e-mails between?

10     A.      Between Tom Bennet, William Brewton and I think

11   Glen Darien ( phonetic); I don't remember his last name.

12   It's the medical.  Mr. Brewton said that he would give me

13   an accomodation if Ms. Mills would agree and Ms. Mills

14   would not agree.

15     Q.      Do you have a copy of the e-mails from

16   Mr. Brewton saying he would give you an accomodation if

17   Ms. Mills would agree?

18     A.      I think so, yes.

19            MR. REITER:   We're going to call for the

20   production of these documents that we've made a document

21   request for.

22     Q.      So you say that there was travel time which is

23   the problem for your work schedule; is that correct?

24     A.      The whole package made it very stressful.

25     Q.      When you say the whole package, what are you

K.  WALD

1   referring to?

2        A.      Travel early in morning, come back.  Well, in the

3   morning I went to Brooklyn so I had to leave an hour, an

4   hour and fifteen minutes before school.  Then I left in the

5   afternoon, it took maybe an hour, an hour and fifteen

6   minutes.  So I got back at 3:00-something and I had to be

7   in work at another place at 5:00.  So I was on the train a

8   lot, all the time, and there was very little time to rest.

9        Q.      So you worked at two different locations during

10  the 2015-2016 school year?

11       A.      Yes.  Well, I didn't work --

12       Q.      Right but the school year as itself --

13       A.      From September 2015, right.  I worked in two

14  different locations.

15       Q.      So in September of 2015, you worked at two

16  different locations.  One in Manhattan and one in Brooklyn;

17  is that correct?

18       A.      Correct.

19       Q.      You only worked at two different locations for

20  September of 2015?

21       A.      What do you mean?

22       Q.      After September 2015, did you still work at the

23  two different locations?

24       A.      Yes.

25       Q.      So how long did you work at the two different

K.  WALD

1    locations for?

2         A.    From the beginning of the school year till I went

3    on terminal leave.

4         Q.    So from September 2015 until you went on terminal

5    leave, you were working at the two different locations?

6         A.    Correct.

7         Q.    When you made this accomodation request, would

8    job hours be more conducive to what adequate rest have

9    been?

10        A.    Well, I had to work 36 hours so I wanted to work

11   two nights and then a full-time schedule during the day.

12   So that means I wouldn't have to go, leave and come back

13   and leave and come back four days in a row.

14        Q.    Okay.   So how many nights were you working?

15        A.    Four nights.

16        Q.    You wanted to work two nights and four days; is

17   that correct?

18        A.    Two nights and five days.

19        Q.    And your schedule was what?

20        A.    Five mornings and four nights.

21        Q.    Okay.   And you wanted to teach at the Manhattan

22   location; is that correct?

23        A.    When?

24        Q.    What schedule did you want the school to grant

25   you?

K. WALD

1    A.    I told you what I wanted.

2    Q.    But where?  Where did you want it?

3    A.    I didn't specify the location.

4    Q.    Since you didn't specify a location, where did

5    you want them to place you?

6    A.    In fact no one asked me where I wanted to go.

7    Q.    So where did you want to go to?

8    A.    Had they given me a program of five days and then

9    two nights, I would have been amenable to many places.

10   Q.    Where would you have been able to go?

11   A.    I could have gone to Queens.  I could have gone

12   to Brooklyn.  I could have gone to New York.

13   Q.    Is Queens closer to your home than Brooklyn?

14   A.    Depending on where it is.  If it was in Queens,

15   Queens is 20 minutes.  There are locations in Queens.

16   Q.    Did you request a specific location to the

17   Department of Education?

18   A.    I was not asked to request anything.  I was told

19   that I wouldn't be given anything.

20   Q.    Who told you that you wouldn't be given anything?

21   A.    Glen Darien.  That Ms. Mills would only partially

22   accommodate the hardship.

23   Q.    Who is Glen Darien?

24   A.    He was the guy in the DOE management position.

25   Q.    Did you tell Glen Darien that you wanted to go to

K. WALD

1    Queens at that time?

2        A.    He did ask me.

3        Q.    But did you tell him that you wanted to go to

4    Queens?

5        A.    Why would I tell him where?  I didn't know what

6    was available.  No one had sat with me to see if they could

7    find something available.  I don't know if Tom Bennett or

8    Patty Crispino in her negotiations -- they both tried to

9    negotiate with Ms. Mills but I was not privy to those

10   negotiations.

11       Q.    So other than this request, you never made a

12   specific request about where you wanted to work in regards

13   to a position closer to your home?

14       A.    Correct.  No more detail than that.

15       Q.    So you never specified what position closer to

16   your home that you wanted?

17             MS. KAPITONOVA:  Objection, asked and

18             answered.  You can answer.

19       A.    Could you repeat the question?

20       Q.    Sure.  You never specified which position closer

21   to your home that you wanted?

22       A.    I didn't have a specific position in mind.

23       Q.    So you never specified which position closer to

24   your home you wanted?

25             MS. KAPITONOVA:  Objection.  You can answer.

K. WALD

1    A.    The nature of the program is there are lots of

2    openings in various schools.  At this time I don't know

3    what was available so nobody sat down with me and said can

4    we try to work out a program with you.

5    Q.    The answer is yes or no.  You didn't specify a

6    position closer to your home that you specifically wanted?

7              MS. KAPITONOVA:   Objection.

8    A.    Had someone asked me would you like to come in

9    and see if you can work out a program, I would have said

10   yes.

11   Q.    Okay.  But nobody did that?

12   A.    Correct.  I would like to say that I tried for a

13   different position that they did have a back to back.

14   Where the time was more consolidated.

15   Q.    You applied for a different position?

16   A.    A counseling position, where the schedule was

17   more consolidated.

18   Q.    When did you apply for the counseling position?

19   A.    Maybe in July of 2015.

20   Q.    So in July of 2015 you applied for a counseling

21   position?

22   A.    Right.

23   Q.    And where would that position have been located?

24   A.    There were various counseling positions.

25   Q.    Where were the various counseling positions?

K. WALD

1    A.      There was one in Brooklyn; there might have been

2    one in Queens or one in the Bronx.  I'm not quite sure but

3    in that case the teacher goes in for six and a half then

4    you leave.  So it reduces the travel time for me.

5    Q.      So it would just be at that one location for six

6    and a half hours?

7    A.      Correct.

8    Q.      If you had taken that position, how would you

9    have worked 46 hours?

10    A.      I could have worked at night the other two times.

11    Q.      Who did you make that application to for the

12    counseling position?

13    A.      I submitted to Ms. Mills.  I don't know who is

14    involved in the application but I submitted it to the

15    department and I'm sure Ms. Mills makes the final decision.

16    Q.      So you submitted it to Ms. Mills?

17    A.      I submitted the application.

18    Q.      Did you ever hear back with respect to the

19    counseling position?

20    A.      I didn't hear back.  I was not given the job and

21    I grieved it.

22    Q.      You grieved on the counseling that you were not

23    given the counseling position job.  When did you grieve

24    that?

25    A.      In September.

K. WALD

1     Q.     September 2015?

2     A.     Correct.

3     Q.     What was the basis of the grievance in

4  September 2015?

5     A.     That she didn't follow the process.  It asked for

6  a tenure teacher and it was given to a teacher who was not

7  tenure.

8     Q.     The counseling position was given to a teacher

9  that was not tenured?

10     A.     Yes.

11     Q.     Your grievance showed that the application was

12  for a tenure teacher?

13     A.     That's what it said on the application.

14     Q.     So the counseling application required someone

15  who was tenured?

16     A.     I'm pretty sure it said tenured or full-time

17  teacher in Adult Ed.

18     Q.     Was the teacher who hired for the position a

19  full-time teacher?

20     A.     She became full-time when she got the job.  Not

21  prior to that.

22     Q.     So you applied for this counseling position prior

23  to making the medical accommodation request; is that

24  correct?

25     A.     Correct.  With a view that that would have helped

48

K. WALD

1    relieve some of the reasons why I needed an accomodation.

2        Q.    I'm sorry.  Can you repeat that?

3        A.    I applied for the other position with a view that

4    that would have helped my medical condition.

5        Q.    So you applied for the counseling position with a

6    view that it would have helped your medical condition?

7        A.    Right.

8        Q.    But you hadn't informed the board of education

9    that you had a medical condition at the time you applied

10   for that position?

11       A.    Correct.

12       Q.    So they were not aware of your medical condition

13   at the time you applied for the counseling position?

14       A.    That's correct.

15             MR. REITER:  Please mark this.

16             (Whereupon, application was marked as

17             Defendant's Exhibit C for identification as of

18             this date by the Reporter.)

19       Q.    Ms. Wald, I'm showing you Defendant's Exhibit C.

20   Do you recognize this document?

21       A.    Yes.

22       Q.    What is this document?

23       A.    Application for a hardship transfer.

24       Q.    So do you see the date that this application

25   was --

K. WALD

1    A.    9/25.

2    Q.    And that's your signature on the application?

3    A.    Yes.

4    Q.    Now what was the purpose of this application?

5    A.    I was instructed to fill out a medical hardship

6    transfer.

7    Q.    Who instructed you to fill out an application for

8    hardship transfer?

9    A.    Either Patty Crispino or Tom Bennett.

10    Q.    And what were you hoping to accomplish by filing

11    this application for hardship transfer?

12    A.    I was trying to reduce the possibility of my

13    getting sick with all the travel and the broken teaching

14    schedule.

15    Q.    Okay.  Did you speak to Patty Crispino and Tom

16    Bennett about this application?

17    A.    Either Patty or Tom Bennet told me to apply for a

18    medical hardship.

19    Q.    When you applied, where were you hoping to be

20    transferred?

21    A.    I didn't have a specific location where; I didn't

22    have access to all of the available positions, okay?  But

23    one could reasonably look at a map and say, I live here so

24    I can travel here.  That's one thing.  Or I can travel

25    there.  That's another thing.  And from there to there or

K.  WALD

1    from here to there, so.

2        Q.       Right.   But if just going by schools within the

3    office of adult continuing education, what would your ideal

4    schedule have been?

5        A.       I was working 36 hours, okay.   Just reduction of

6    travel so that I would have more time rest in between the

7    positions, the teaching jobs.

8        Q.       Okay.  So you still wanted to --

9        A.       So I didn't have to work, you know, from 7:30 in

10   the morning until 9:30 at night, four days week, which is

11   basically what my schedule was in September of 2015.

12       Q.       Did you want to be transferred from either the

13   Manhattan location or Brooklyn location?

14       A.       Would I want to be transferred?

15       Q.       Yes.

16       A.       I wanted a more workable schedule.   I didn't

17   necessarily care if I was transferred.   If a schedule could

18   have been composed, created then that would have been fine.

19   It says here, hours more conducive to adequate rest.

20       Q.       What are you referring to?

21       A.       From Exhibit B. So if a better position in

22   Brooklyn would have been created so that I wouldn't have to

23   travel four nights a week or something like that, that

24   would have be fine.

25       Q.       So a better position.   So you would have wanted

K. WALD

1      them to create a position in Brooklyn for you?

2      A.      As I said, I traveled from quarter after 10:00 in

3      the morning and I was finishing working at 9:30 at night,

4      four nights a week, okay?  If something was brought to my

5      attention that would have reduced that very difficult

6      schedule for me because I just started chemotherapy, I

7      might have been very amenable.   Nothing was provided.

8                  MR. REITER:  Mark this exhibit, please.

9                  (Whereupon, ADA form was marked as

10                 Defendant's Exhibit D for identification as of

11                 this date by the Reporter.)

12     Q.      Do you recognize this document?

13     A.      Yes.

14     Q.      What is this document?

15     A.      ADA accommodation form.

16     Q.      So this is in regard to the accommodation request

17     that you filed; is that correct?

18     A.      Correct.

19     Q.      You've seen this document before?

20     A.      Yes.

21     Q.      Now this document specifically states your

22     request was medical warranted; is that correct?

23     A.      That's what it says.

24     Q.      It also states that Equal Opportunity has

25     discussed the accommodations listed below and has received

K. WALD

1    an e-mail confirmation from the employee supervisor that

2    these accommodations will be implemented; is that correct?

3        A.    I don't know what she did, what the supervisor

4    did with the OEO.

5        Q.    Is that exactly what it states on the letter?

6        A.    Yes.

7        Q.    In the letter itself, this is signed by William

8    Brewton; is that correct?

9        A.    Yes.

10       Q.    It states that per Superintendant Mills,

11   Ms. Wald's request to be assigned to a school closer to

12   home cannot be accommodated because there are no available

13   openings; is that correct?

14       A.    Yes.

15       Q.    It also states, please note from the e-mail that

16   Ms. Wald was working at a site near her home when she gave

17   up the option; is that correct?

18       A.    No.

19       Q.    But is that what it states on this document?

20       A.    Yes.

21       Q.    It also states, please note that the board can

22   accommodate Ms. Wald with a reduced schedule, is that

23   correct?

24       A.    That's what it says.

25       Q.    Now it states that as I mentioned, that you were

K.  WALD

1   working at a site near your home for 2014-2015 school year

2   and you gave up the option.   You mentioned that that's not

3   correct.   Why is that not correct?

4       A.      I live on East 17th Street and West 35 Street so

5   it took 20 to 25 minutes to get there.   There are some

6   places where I could have gone to Queens where it would

7   have taken 20 to 25 minutes.   Well the option was giving up

8   thinking that I was going to get something else, okay, as

9   the chapter leader.   So I gave it up thinking that there

10  would be something available and then the rug was pulled

11  out.

12      Q.      So you're saying you gave up your schedule at

13  West 35 Street because you were the chapter leader; is that

14  correct?

15      A.      No.   I gave up my schedule at West 35 Street

16  because there were other teacher's that retired and I

17  thought that those jobs would be listed in the placement

18  center when I gave up my job to look for a new job.

19      Q.      So you how did you find out that teacher's were

20  retiring?

21      A.      I was the chapter leader.

22      Q.      So the teacher's told you that they were

23  retiring?

24      A.      I requested that the teacher's who were retiring

25  to submit their paperwork early because the prior year

K.  WALD

1   there was a few teacher's that were retiring and their

2   papers were not completed so their jobs were not put on the

3   placement center list.  So in order to make the retiring

4   teacher's jobs available to other teacher's, I had the

5   retiring teacher's make sure that their job, their retiring

6   papers were handed in a timely fashion prior to the end of

7   the year.

8        Q.    So you thought that those teacher's would file

9   their requirement papers at the end of the 2014-2015 school

10  year?

11       A.    I know they did.

12       Q.    So you're saying that they did file their papers

13  on time?

14       A.    Right.

15       Q.    So did you know the positions that were going to

16  to be available?

17       A.    Yes.

18       Q.    Before you requested a schedule change?

19       A.    Yes.

20       Q.    And you're saying that they were not available at

21  the hiring hall?

22       A.    That's correct.

23       Q.    Why were they not available at hiring hall?

24       A.    Ms. Mills didn't want to make them available.

25       Q.    How do you know that Ms. Mills didn't want to

K. WALD

1    make them available?

2        A.      I was the chapter leader.

3        Q.      Right.  But did she specifically tell you that

4    she didn't want to make them available?

5        A.      The prior year when teacher's were retiring, was

6    to make the paperwork complete and she would put that job

7    on the list.  So in order to not get into that mess, okay,

8    we had all of the teacher's complete their papers

9    beforehand so we knew those jobs would be available.  But

10   then there's this little rule or something where she has

11   the right not to put the job on the list until July 1st in

12   case the teacher is going to change his mind.  A lot of

13   principals don't do that but Ms. Mills did do that and jobs

14   where teacher's retired were not listed.

15       Q.      Did Ms. Mills tell you that the jobs were not

16   going to be listed prior to you requesting a schedule

17   change?

18       A.      No.

19       Q.      So when did you find out that the job that you

20   thought was going to be listed was not actually listed?

21       A.      When I had to look for a new position.

22       Q.      When was that?

23       A.      The day of the placement center.

24       Q.      On June 29, 2015?

25       A.      If that was the date, that's correct.

K.  WALD

1    Q.    So you showed up for the hiring hall on that day?

2    A.    Yes.

3    Q.    And you thought the positions would be available

4    when you showed up at the hiring hall that day?

5    A.    Correct.

6    Q.    They were not available on June 29, 2015?

7    A.    Correct.

8    Q.    Did you speak to anyone at the hiring hall and

9    ask where those positions were?

10   A.    Correct.

11   Q.    Who did you speak to?

12   A.    Patty Crispino and Ms.  Mills.

13   Q.    There were at the hiring hall that day?

14   A.    Yes.

15   Q.    What did Ms.  Mills say to you that day?

16   A.    That she wasn't going to put them on the list.

17   Q.    Why did she say she wasn't going to put them on

18   the list?

19   A.    She didn't have to until July 1.

20   Q.    So technically she didn't have to put those jobs

21   on the list for the hiring hall.

22   A.    Right.  Technically.  But a teacher on June 29 is

23   not going to change his mind on June 30 and say I'm not

24   retiring.

25   Q.    But Ms.  Mills technically did not have to put

K.  WALD

1    those jobs on the hiring hall list?

2        A.      Right.  But many other places they do.

3        Q.      When you say other places?

4        A.      Many other programs, they do.

5        Q.      Aside from Adult Education?

6        A.      Correct.

7        Q.      So what schedule did you think you were going to

8    be assigned at the hiring hall?

9        A.      Well I knew there were retiring teacher's and I

10   knew I had some seniority so I thought I might get one

11   program where I could work two nights a week and the rest

12   where I would work in the day time.  The idea was not to go

13   to work four nights a week and come home at 9:30 and then

14   go to work at 7:30.

15       Q.      So your goal was to go home two nights a week?

16       A.      Correct.

17       Q.      And how many days a week did you say you worked?

18       A.      Five days and four nights.  I wanted to reduce it

19   so I wouldn't have to go four nights.

20       Q.      So your intention at the hiring the hall --

21       A.      My hope.

22       Q.      -- your hope at the hiring hall was to go five

23   days a week and then two nights a week?

24       A.      That was my hope but maybe there could have been

25   something else that would have accommodated me so that I

K.  WALD

1    wouldn't have been going to work all day for four days,

2    morning, afternoon, night.

3        Q.      All right.  So I'm going back to Exhibit D right

4    here, which is the letter that we had just been talking

5    about.  Do you have Exhibit D in front of you?

6        A.      Yes.

7        Q.      Now after you submitted your accommodation

8    request, which was on August 26, 2015, Ms. Wald stated that

9    there were no openings at schools closer to your home and

10   therefore you cannot be accommodated.  So if there were no

11   openings at this time on October 8, 2015, how could you

12   have been given an accomodation?

13       A.      I was not privy to, okay.  Ms. Mills stated that,

14   okay.  I didn't see the available jobs there were available

15   to see if I can change my schedule.  Those discussions went

16   on with either Tom Bennett or William Brewton, I don't

17   recall.  Ms. Mills had the flexibility to accommodate me if

18   she wanted to.

19       Q.      How do you know that she had the ability to

20   accommodate you if she wanted to?

21       A.      Because my schedule in BALC.  The schedule is

22   usually let's say 9:00 to 12:00, I don't remember exactly.

23   9:00 to 12:00 in the morning, okay.  But I don't work on

24   Saturdays as I mentioned, okay.  And so I couldn't stay in

25   Brooklyn until 3:30 and then get home in the winter for

K. WALD

1  Saturday because Friday night starts early, okay.  So she

2  changed the schedule so that it was 9:00 to 1:34 so I won't

3  have to be there later.   Another teacher started at 8:30,

4  okay.  So Ms. Mills had the flexibility to change the

5  hours.

6      Q.    So you say another teacher started at 8:30?

7      A.    Right.

8      Q.    Who was that teacher?

9      A.    Joy Liberman (phonetic).

10     Q.    So you're saying that in the beginning of the

11 school year she was initially starting at 9:30 and then she

12 changed her schedule changed to 8:30?

13     A.    She started at 8:30 where as most of the

14 teacher's started at 9:00.

15     Q.    You started at 9:30 --

16     A.    No.  I started at 9:00 but I worked until 1:34.

17     Q.    So if you started at 8:30, what would your

18 schedule have been?

19     A.    I don't know.  It could have worked out.  I mean,

20 she could have made it from 8:30 to 2:00.  So then, I don't

21 know, I was getting a half hour in the morning and a half

22 hour -- I don't know, whatever it would have made up, six

23 hours, whatever, right.  If I got an hour a day for five

24 days.  She could have made it.  And then I would only have

25 to go two nights.  I'd have to work out the schedule but

K.  WALD

1    she had flexibility in the timing of the classes and the

2    hours in the BALC.  She said that.

3        Q.    What's the BALC?

4        A.    That's the Brooklyn location.

5        Q.    So she said that she had flexibility to change

6    the hours of your --

7        A.    She changed my hours because I couldn't work on

8    Saturday.  On Friday and late in the afternoon from

9    Brooklyn.

10       Q.    So she accommodated your religious observances?

11       A.    Correct.  And she accommodated the other teacher?

12       Q.    But your schedule had been set before this

13   accommodation request was denied, correct?

14       A.    My schedule was set at the placement center.

15       Q.    Right.  So when the school year started, how

16   could Ms. Mills have accommodated you without changing

17   other teacher's classes?

18       A.    It has nothing to do with other teacher.  It's

19   just a class.  My schedule has nothing to do with other

20   teacher's.

21       Q.    So you received this letter, correct?

22       A.    Correct.

23       Q.    Did you suggest any of these options to either

24   Patty Crispino or Tom Bennett to propose to Ms. Mills?

25       A.    I'm sure I did.  And I'm sure Patty Crispino did.

61

K. WALD

1    Q.    So what did you say to Patty Crispino that she

2    told to Ms. Mills?

3    A.    That she had flexibility to work with the

4    schedule or she could have showed me but Ms. Mills engaged

5    in dialogue with me.

6    Q.    Okay.  What did Patty Crispino say to Ms. Mills

7    to the best of your knowledge?

8    A.    To the best of my knowledge I'm sure she tried to

9    get Ms. Mills to accommodate my schedule.

10   Q.    Without proposing any --

11   A.    I don't know what she proposed, okay.  But she

12   knows what I was looking for as did Tom Bennett, okay, as

13   did William Brewton and they talked to Ms. Mills.  I

14   didn't.  Ms. Mills never talked to me.

15   Q.    So you're saying that your issue would not have

16   depended on the classes that were being taught themselves

17   but on the hour of the classes?

18   A.    She established a new class for me.

19   Q.    When did she establish a new class for you?

20   A.    When I started in September.  That class did not

21   exist prior to me.

22   Q.    Right.  So when this accommodation request was

23   made, how could she accommodate your schedule without

24   changing the classes that had already been set in stone?

25   A.    They've all been in closed classes all the time.

K. WALD

1    Q.    Right.  But isn't that based on demand in terms

2    of the amount of students in the room?

3    A.    I don't know what -- if it's based on demand or

4    for whatever reasons.  But opening and extending the length

5    of a class doesn't have anything to do with demand; it's

6    just extending the length.  To the class you could stay an

7    hour longer or could you come an hour earlier.

8    Q.    Did you ever convey that in your discussions with

9    Ms. Mills or did anyone else?

10   A.    Ms. Mills never spoke to me.

11   Q.    Did your representative ever convey that?

12   A.    I would assume they definitely did.

13   Q.    Do you have an communication reflecting that that

14   request was made?

15   A.    No.  I would like to say something else?

16   Q.    Go ahead.

17   A.    In my class my students often came early as I

18   came early to get ready and they stayed later.  So you

19   spoke about demand, who knows if they would have stayed.

20   Q.    I'm sorry.  I'm not following.

21   A.    You said that she doesn't know if there was any

22   demand.  My students often came early and wanted to stay

23   later, okay.  So extend the hours of the class.  There

24   might have been plenty of students who were willing to do

25   that.

K. WALD

1    Q.      Wouldn't have extending the hours made you get
2    home later in the night?
3    A.      I would have only had to go to work two nights
4    instead of four.
5                    MR. REITER:  Mark this exhibit please.
6                    (Whereupon, letter was marked as Defendant's
7                    Exhibit E for identification as of this date by
8                    the Reporter.)
9    Q.      I'm handing you what has been marked as
10   Defendant's Exhibit E.  Do you recognize that document?
11   A.      Yes.
12   Q.      It is the letter you received from the Department
13   of Education on October 9, 2015?
14   A.      Yes.
15   Q.      And it's stated that your request for medical
16   accomodation has been partially provided in the form of a
17   reduced work schedule; is that correct?
18   A.      That's what it says, yes.
19   Q.      Now it also states that your request for an
20   assignment closer to home cannot be accommodated
21   administratively; is that correct?
22   A.      Yes.
23   Q.      So after you received this letter, what happened
24   next?  Were your hours reduced?
25   A.      No.   I didn't do that and I went on terminal

K.  WALD

1    leave.   I applied for terminal leave after this.

2         Q.     In December of --

3         A.     I have to apply a month before.

4         Q.     So you applied after you received this letter for

5    terminal leave?

6         A.     Soon after.  I don't know exactly when.  I had to

7    inform myself how that would happen etc. and then I applied

8    for terminal leave.

9         Q.     So after the Department of Education sent you

10   this letter, did they offer to reduce your hours?

11        A.     I think so.

12        Q.     And you declined that offer for less hours?

13        A.     I have a question.

14        Q.     Sure.

15        A.     Does your request for assigning schools closer to

16   home cannot be, how do they know what route was closer to

17   my home?

18        Q.     I cannot answer that question.

19        A.     Just put that down.

20        Q.     But this letter itself says that your request for

21   an assignment closer to home cannot be accommodated?

22        A.     I'm just curious if when the decision was made,

23   okay.  If they took Google Maps and say I live five miles

24   in this direction and this direction and see what's closer

25   to home than Nostrand Avenue.  So I want to know if that

K.  WALD

1      was ever done.

2          Q.      So you're saying that the Queens location would

3      have been closer than the Brooklyn location?

4          A.      Yes.

5          Q.      Why didn't you apply to a Queens location when

6      you went to the hiring hall on June 29, 2015?

7          A.      Why didn't I apply?  Because there were none.

8          Q.      So there was no vacancies in Queens?

9          A.      As far as I recall there were none.  I think

10     there was a problem getting a consolidated program, okay.

11     In the morning and the night.  If there was one in Queens,

12     I promise you, I would have taken it.

13         Q.      If there was nothing available at the Queens, how

14     could they have accommodated your schedule

15     administratively?

16         A.      As I said she accommodated my schedule

17     administratively in Brooklyn because of religious

18     observances.

19         Q.      Right.  But that was back in June 29, 2015,

20     correct?

21         A.      She could have just extended the hours.  I don't

22     know if she could have looked, I mean, I could have left my

23     program to see if I could have put anything else together.

24         Q.      If there was an opening at the Queens your

25     saying?

K. WALD

1      A.      As I said, this is an assumption of what's closer

2   to home based on whoever wrote this.  I don't know how they

3   knew what was closer to home than I did.

4      Q.      Right.  But you received this letter on October

5   9, 2015, correct?

6      A.      Correct.

7      Q.      Did you then say to Tom Bennet that you wanted to

8   change your schedule to Queens?

9      A.      Based on my telephone conversations as far as I

10  recall.  I'm sure there were very very adamant advocates

11  that tried to get me a more accommodating schedule.

12     Q.      In Queens I'm asking?

13     A.      Anywhere.

14     Q.      But anywhere wasn't my question.

15     A.      I don't know what was available because I wasn't

16  privy to the available job at the time or to discussions.

17     Q.      My question is simply, did they make a request

18  for you to have your schedule changed to work at a location

19  in Queens?

20     A.      I don't know what was said.  They made it where I

21  could work.

22     Q.      Did you tell them that you wanted to work at the

23  location closer to your home in Queens?

24     A.      This issue was not if it was closer to home.  If

25  it was closer to home in a way to reduce the travel time.

K. WALD

1    If it was that I had to travel a little more but not four a

2    day, then that would have been better.  The idea was to

3    reduce, so that I wouldn't have travel every day from 7:30

4    in the morning to 9:30 at night.

5        Q.    But in the accommodation request form you

6    submitted you did specifically request for a position

7    closer to home, correct?

8        A.    That was an option, right.  But I'm sure that

9    they negotiated for anything that could have been made.

10       Q.    My question is, did you state to either your

11   union rep or anyone at the Department of Education that you

12   would have been amendable to working at the location in

13   Queens?

14       A.    I'm sure I did.

15       Q.    You are sure that you did say that?

16       A.    Yes.  I don't know I said that but I'm sure they

17   knew that.

18       Q.    You don't know if you said that but you're sure

19   that they knew that --

20       A.    Right.

21       Q.    -- even though you didn't necessarily say that?

22       A.    I don't know what I said but they knew the issue

23   just as I described to you the issue.  It was the traveling

24   from 7:30 to 9:30 four days a week, that terrified me.

25       Q.    Okay.

K. WALD

1          THE WITNESS:  Can we take a break?

2          MR. REITER:   Of course.

3          (Whereupon, a short break was taken.)

4     A.     I want to clear something up for you, okay.   You

5     asked me how do I know that Tom Bennett and Patty Crispino

6     knew what I wanted.   Because I recently won an arbitration

7     for 36 hours.   I need those additional hours for my

8     retirement and I worked very hard for them and waited a

9     long time.   So Patty Crispino knew I needed those 36 hours

10    and she knew the nature of my condition.   If it was

11    possible to make something for more amenable so that I

12    could keep those hours.   She knew that I would not be

13    willing to give up those six hours and she negotiated.   I'm

14    sure she did, okay.   To try to get the easiest schedule for

15    me while maintaining those hours.   So, you know, I didn't

16    have to say, did you find something in Queens, did you find

17    something here.   She knew how to make up a schedule.   She

18    sat with me I did chapter leader for three years making up

19    schedules and negotiating so since I didn't have a direct

20    negotiation or dialogue with Ms. Mills, she was my

21    mouthpiece and I trusted her.   She knew exactly what I

22    needed and I had no problem in trusting her with any way to

23    accommodate me so that I wouldn't have to give up those

24    work hours.   And anything that she could have put together,

25    I'm sure would have been extremely satisfactory.

K. WALD

1    Q.    Did Ms. Crispino tell you that there was nothing

2    that the DOE could do to accommodate you?

3    A.    I got this letter.

4    Q.    Right.  I'm saying did Ms. Crispino specifically

5    say anything to you about it?

6    A.    She said that Ms. Mills was not willing to

7    accommodate my schedule with all the hours.

8    Q.    What did she mean by that statement?

9    A.    Ms. Mills was very unwilling to accommodate

10   anybody.  I was the chapter leader for three years;

11   everything with Ms. Mills was a battle.

12   Q.    That's what Ms. Crispino said to you?

13   A.    No.  I'm telling you.

14   Q.    I'm specifically asking what Ms. Crispino said to

15   you?

16   A.    She said that in so many words.  I don't recall

17   exactly what she said, that Ms. Mills was not willing to

18   accommodate me with what I needed.  She said that she could

19   give me reduced work, that's all.  But I know from

20   experience that Ms. Mills never talked to me, if it wasn't

21   as a chapter leader.  And everything when I had to

22   negotiate with Ms. Mills was a battle.

23   Q.    But she said she could give you a reduced

24   schedule?

25   A.    She said she could give me a reduced schedule but

K. WALD

1    I didn't want a reduced schedule.

2        Q.    I'm not saying whether you wanted it.   But she

3    did offer you a reduced schedule; correct?

4        A.    Yes.

5        Q.    Okay.   In paragraph 13 of your complaint you

6    allege that because of the failure to reasonably

7    accommodate, plaintiff, Ms. Wald had to take a reduced

8    wage, which would not have been necessary if the

9    accommodation request to work closer to home had been

10    accommodated.   When were you required to take a reduced

11    wage?

12        A.    When they wanted to give me the reduced work

13    schedule.

14        Q.    But you didn't accept that reduced work schedule?

15        A.    No.   I left instead.

16        Q.    So you never actually took a reduced wage; is

17    that correct?

18        A.    Correct.

19        Q.    So that is not true in the complaint you had

20    made?

21        A.    I couldn't accept the offer of a reduced wage.

22        Q.    So you never took the reduced wage, correct?

23        A.    Correct.

24            MS. KAPITONOVA:   I have to clarify, we're

25            talking Exhibit A, correct?

K. WALD

1          MR. REITER:  Correct.  We're talking about

2          the complaint, which is Exhibit A.

3          MS. KAPITONOVA:  So what page is that on?

4          MR. REITER:  That would be page four of

5          eight.

6          MS. KAPITONOVA:  Four.

7          MR. REITER:  Please mark this exhibit.

8          (Whereupon, schedule was marked as

9          Defendant's Exhibit F for identification as of

10          this date by the Reporter.)

11    A.    I just want to say this.  Had I taken the reduced

12    schedule it would have had a material effect on my

13    retirement.

14    Q.    Right.  Had you taken the reduced schedule.

15    A.    So I had to consider that.

16    Q.    But you did not take the reduced wage?

17    A.    For the reasons that I had mentioned.

18    Q.    Does this document accurately reflect your

19    schedule for the 2014-2015 school year and for 2015-2016

20    school year?  Take your time.

21    A.    Yes.

22    Q.    So you only taught a total of 24 hours a week

23    during the 2014-2015 school year; is that correct?

24    A.    Correct.

25    Q.    And the remaining six hours of your schedule

K.  WALD

1    during the 2014-2015 school year was dedicated to union

2    duties?

3        A.      Correct.

4        Q.      How long did you have union duties during the

5    time period that you were employed by the DOE?

6        A.      For three years.

7        Q.      So what was your position with the union for

8    three years?

9        A.      I was chapter leader.

10       Q.      What year were you elected to become the chapter

11   leader?

12       A.      2012.

13       Q.      What union were you part of?

14       A.      UFT.

15       Q.      Can you just state what that stands for, please,

16   for the record?

17       A.      The union -- is it united?  I forgot -- Union

18   Federated teacher's or United Federated teacher's.

19       Q.      And you stated previously that you were the

20   chapter chair person?

21       A.      Chapter leader.

22       Q.      And you were the chapter leader from 2012 until

23   when?

24       A.      Until June 30, 2015.

25       Q.      So you were the chapter leader until the day

K. WALD

1    after the hiring hall?

2        A.      Yes.

3        Q.      And you were the chapter leader throughout the

4    duration of the 2014-2015 school, correct?

5        A.      Yes.

6        Q.      What were your responsibilities as a chapter

7    leader?

8        A.      To consult with Ms. Mills because she was the

9    person with whom consultations took place and we

10   represented teacher's, educate the teacher's, work with the

11   teacher's in various regions, work with the principals and

12   try to create a better working environment.

13       Q.      Did you have to be elected to this position as

14   the chapter leader?

15       A.      Yes.

16       Q.      When was the election held ever year?

17       A.      It was on a three-year basis.

18       Q.      So it was three-year term?

19       A.      Yes.

20       Q.      Do you remember that date of your election for

21   chapter leader in 2012?

22       A.      No.   Sometime in June.

23       Q.      And when was the voting held for the chapter

24   leader position in 2015?

25       A.      Sometime in June.

K.  WALD

1        Q.      So sometime prior to June 30, 2015?

2        A.      Correct.

3        Q.      Did you run against someone for the chapter

4    leader?

5        A.      I didn't run.

6        Q.      Okay.   So you didn't run?

7        A.      I was too sick.

8        Q.      Were you planning on running?

9        A.      No.

10        Q.      You knew that you were not going to run for

11    re-election at the end of your term?

12        A.      Correct.

13        Q.      When did you decide that you were not going to

14    run for re-election as the chapter leader?

15        A.      I don't know.   April, May, June.  I was getting

16    sicker.  It was a very arduous and intensive job with long

17    hours and at that time I was very nervous about my

18    condition.

19        Q.      If not for your medical condition keeping you

20    from running, do you think you would have a run again for

21    chapter leader position?

22        A.      Yes.

23        Q.      Who took over the chapter leader position once

24    you decided not to run for re-election?

25        A.      The person who was elected.

K. WALD

1    Q.    Who is that person?

2    A.    Irene Rosa (phonetic).

3    Q.    Now you mentioned previously that you had filed a

4    grievance during the 2014-2015 school year to add

5    additional hours to your schedule produced in the 2015-2016

6    school year?

7    A.    No.

8    Q.    You didn't try to file a grievance to try to

9    obtain more hours teaching?

10   A.    I filed a grievance.   It was not in 2014.

11   Q.    When was it filed?

12   A.    Seven years, I think perhaps six or seven years

13   prior to that.

14   Q.    The grievance you had filed for an additional six

15   hours you filed six or seven years prior to that?

16   A.    Six or seven year prior to that.

17   Q.    Do you remember the year it was filed?

18   A.    Maybe 2008.   I don't remember years about

19   anything.   Perhaps, but it was five or six years prior to

20   that, it was a big arbitration.

21   Q.    Was it just for you or for other teacher's as

22   well?

23   A.    It set a precedent so that it impacted many

24   teacher's.

25   Q.    But the arbitration was solely brought by you?

K.  WALD

1      A.      Correct.

2      Q.      So you won this grievance.   When was that

3   grievance decided?

4      A.      If I think in April 2015.   Don't quote me but I

5   think then because it started in November then I think it

6   was decided in April.   For some reason it kept getting

7   messed up.

8      Q.      Okay but the grievance was decided so that you

9   could add the additional hours to your schedule for the

10   2015-2016 school year?

11      A.      Yes.

12      Q.      So if you look at Exhibit F, which I handed to

13   you, your schedule for the 2015-2016 school year reflected

14   that the additional hours that you were entitled to were

15   placed on the grievance you had filed?

16      A.      That's correct.

17      Q.      So you wanted more teaching hours added to your

18   schedule?

19      A.      Correct.   And the past years they didn't have

20   those hours I was paid for, okay.   So by eliminating those

21   hours I would have a reduction in salary.

22      Q.      Right.   In your complaint, which is Exhibit A,

23   you allege that you were forced to take a job assignment

24   with the DOE in Bedford-Stuyvesant, Brooklyn for five

25   mornings a week from 9:00 a.m. to 1:34 p.m.

K.  WALD

1    A.    Where is that?

2    Q.    That would be paragraph 14 on page four.

3    A.    There were other jobs but this is the one that

4    Ms. Mills had arranged the hours so that I could not work

5    on Friday afternoons, okay.   That I could leave on time on

6    Friday afternoon.   That's why.   There were other positions

7    but she wasn't willing to be flexible with time in other

8    places.   She only wanted me; she would only be flexible

9    with the time, which was 1:43 and be in Brooklyn.

10   Q.    When you say she wasn't willing to be flexible in

11   in other places, are you saying that she could have been

12   flexible in other places?

13   A.    I don't know if she could have, okay.   But she

14   wasn't, right.   I don't know if she could have.

15   Q.    So she was already working to your religious

16   observances and providing you with a schedule that required

17   you to work in Brooklyn for five mornings per week; is that

18   correct?

19   A.    She had a problem, okay.   There was already a

20   grievance filed for religious observance.   I'm sure she

21   wasn't going to look for another grievance for religious

22   observance but I didn't get home until midnight.

23   Q.    Right.   But my point is she accommodated your

24   religious observance with the schedule that you had before

25   the 2015-2016 school year?

K. WALD

1    A.    Right.

2    Q.    So how then were you forced to take a job in

3    Bedford-Stuyvesant?

4    A.    There wasn't another place where she was willing

5    to do that.

6    Q.    When you say they, was she able to do that?

7    A.    I don't know.

8    Q.    Based on the availability?

9    A.    Based on, okay.  This was the only one that she

10   said she would change the schedule, okay.  Do I know if she

11   could have someplace else, I don't know that.

12   Q.    So just so we're clear.  Based on the schedule in

13   2015-2016, you worked at both the Alternative Education

14   Complex on West 35 Street and also the Brooklyn Adult

15   Learning Center; is that correct?

16   A.    Right.

17              MR. REITER:  Please mark this exhibit.

18              (Whereupon, e-mail was marked as Defendant's

19              Exhibit G for identification as of this date by

20              the Reporter.)

21   Q.    All right.  I want to show you what's been marked

22   as Defendant's Exhibit G.  Ms. Wald, do you recognize this

23   e-mail dated Sunday, June 14, 2015?

24   A.    I don't recall.  It might have been mailed to me.

25   Q.    If you look under forwarded message, do you see

K.  WALD

1       where it says from Wald, Karen A.?

2            A.      From teacher's schedule sent to Rosemary Mills.

3            Q.      I'm sorry.   If you look under -- do you see where

4       it says forwarded message?

5            A.      Yes.

6            Q.      Do you see where it says from Wald, Karen A.?

7            A.      Yes.

8            Q.      Is that your e-mail address?

9            A.      Yes.

10           Q.      And you said that the date of that e-mail you

11      sent was Sunday, June 14, 2015; is that correct?

12           A.      Yes.

13           Q.      Is the subject of the e-mail you sent is

14      placement center for adult education teacher's hiring hall;

15      is that correct?

16           A.      Yes.

17           Q.      Okay.   And underneath in the body of that e-mail

18      it says schedule change form; is that correct?

19           A.      Correct.

20           Q.      And you typed your name under this schedule

21      change for; is that correct?

22           A.      Correct.

23           Q.      Do you see where it says full-time teacher's in

24      the body of the e-mail?

25           A.      Correct.

K. WALD

1      Q.      Do you see where it says I am a full-time teacher

2    and will change my entire schedule, I will remain a

3    full-time teacher and I will attend the hiring hall.   And

4    you check the box; is that correct?

5      A.      That is correct.   And I explained to you that I

6    have prior knowledge about other teacher's leaving so I

7    signed it with the expectation that those other positions

8    would be available.

9      Q.      Prior to signing this schedule change form, did

10   you speak to Ms. Mills about when those openings would be

11   available?

12     A.      No.   Because I based it on her comments from the

13   prior year.   As I said, I never had conversation with

14   Ms. Mills other than in consultation or the -- if there was

15   an arbitration or something.   But based on her actions the

16   prior year I thought I had planned well for this year.

17     Q.      But you did follow up with Ms. Mills to see

18   specifically if the positions that you thought were going

19   to available were actually going to be available at the

20   hiring hall?

21     A.      Why would I have a reason to doubt her word?

22     Q.      When you say doubt her word, what are you

23   referring to?

24     A.      Based on what she said the prior year, why would

25   I doubt that it's not the same this year.

K. WALD

1      Q.      When you say what she said the prior year, what

2    conversation are you referring to?

3      A.      The reason why the senior teacher's schedules

4    were not put on the placement list was because the

5    paperwork was not completed, okay.  So this year the

6    teacher's who were retiring completed their paperwork ahead

7    of time.  The jobs that they informed Ms. Mills that they

8    would not be returning and I knew that.  I had copies of

9    their retirement papers.

10     Q.      When you showed it to the hiring hall, were you

11   surprised to know that these positions were not available?

12     A.      Very surprised.

13     Q.      Did you say anything to Ms. Mills?

14     A.      Yes, I did.

15     Q.      What did you say?

16     A.      I said, here are the retirement papers based on

17   the discussions from the prior year; why aren't these jobs

18   available.

19     Q.      What did she say in response to you?

20     A.      She said she wasn't putting them on the list.

21     Q.      In the schedule change form it specifically

22   states in the body of that e-mail, by electing to change

23   your schedule, you will give up protection to your current

24   class, your current class schedule will be offered to other

25   employees at the placement center; is that correct?

K. WALD

1      A.      Yes.

2      Q.      Can you just explain to me what the hiring hall

3   is?

4      A.      Teacher's who have changes in schedule, okay.

5   They need to replace those hours, okay.  So that they can

6   have how many hours they worked.  If for one reason a class

7   is closed and another one is open or they live in Rhode

8   Island and they don't want to work in Coney Island, they

9   would go to the hiring hall to look for a different

10  position.

11     Q.      In light of that fact that you had an additional

12  six hours granted to you for 2015-2016 school year, would

13  you have had to go to the hiring hall or no?

14     A.      I would have had to go because I had to add six

15  hours and I would have had to go because I'm chapter

16  leader.

17     Q.      So as chapter leader you always have to change

18  your schedule?

19     A.      No.  As chapter leader I had to go to the hiring

20  hall.

21     Q.      So you have to attend the hiring hall but you

22  don't have to attend for the purpose of changing your

23  schedule?

24     A.      Correct.

25     Q.      But you would have to go to the hiring hall to

K. WALD

1   change your schedule because of the additional six hours

2   that were added to your schedule?

3        A.      Correct.

4        Q.      So even if the positions that you thought were

5   going to be available were not available, had you been

6   informed that they were not going to be available, you

7   still would have to go to the hiring hall to change your

8   schedule, correct?  Do you understand my question?

9        A.      Go ahead and rephrase it.

10       Q.      Sure.  If you don't understand a question, just

11  please let me know.  So you thought certain positions were

12  going to be available at the hiring hall and then you

13  testified that you later found out that they were not

14  available when you showed up at the hiring hall, right?

15  But because an additional six hours were added to your

16  schedule as a result of the arbitration, you would have had

17  to change your schedule regardless of if those positions

18  that you thought were going to be available were not

19  available?

20               MS. KAPITONOVA:   Objection.

21       A.      No.

22               MS. KAPITONOVA:   I'm sorry, if you

23  understand that question.

24       A.      No.  I would not, for myself I might not have.  I

25  could have kept this schedule and added more hours to see

K. WALD

1      if there were more hours to work at the present location.

2          Q.      So you could have kept your schedule for the

3      2014-2015 school year and just added hours on to that

4      you're saying?

5          A.      Yes.

6          Q.      So why didn't you just do that at the hiring

7      hall?

8          A.      Because since she didn't open this my schedule

9      was no longer available.

10         Q.      Because you went to the hiring hall?

11         A.      No.   Because she didn't open the retired

12     teacher's positions then my schedule was taken by someone

13     else.   Because it says here as you read, by electing to

14     change, will be offered to other employees.

15         Q.      So what would the process have been for you to

16     change your schedule for the 2014-2015 school year and add

17     an additional six hours?

18         A.      I would have had to keep this and just add the

19     six hours, which you see would have been available from the

20     schedule to almost anyone.

21         Q.      How would you have gone about adding those six

22     hours?

23         A.      I would have had to go to the hiring hall.

24         Q.      By going to the hiring hall, do you automatically

25     give up your schedule from the past year?

K. WALD

1      A.      No.   You can add or subtract hours.

2      Q.      So you don't have to give up your whole schedule

3   at a hiring hall necessarily?

4      A.      No.

5      Q.      Did anyone force you to give up your schedule for

6   the 2015-2016 school year?

7      A.      What do you mean by force?

8      Q.      Did anyone say you must change your schedule for

9   the 2015-2016 school year?

10     A.      No.   I told you.   I could have kept that, right.

11  And that would have worked out that I would have worked how

12  many nights -- I had 24 hours -- I would have worked three

13  nights, okay.   Instead of four nights.   And had I kept my

14  schedule, it would have been three nights instead of four

15  nights.   Given my prior knowledge I thought it would have

16  been a healthier choice to give it up and get something

17  that would have helped me preserve my health.

18               MR. REITER:   Please mark this exhibit.

19               (Whereupon, schedule form was marked as

20               Defendant's Exhibit H for identification as of

21               this date by the Reporter.)

22     Q.      Ms. Wald, I'm showing you what's been marked as

23  Defendant's Exhibit H.  Do you recognize that document?

24     A.      Yes.

25     Q.      What is this document?

K. WALD

1      A.      This is a schedule from 2015-2016.

2      Q.      So would this be the schedule form that you

3   submitted at the hiring hall on Monday, June 29, 2015?

4      A.      This was the schedule that I was given.

5      Q.      After you had made your request to change your

6   schedule for the 2016 school year?

7      A.      Right.  There wasn't much for me to choose from.

8   This was the schedule.

9      Q.      Okay.  So this was the schedule that you decided

10  upon at the hiring hall?

11     A.      This was the schedule that was available to meet

12  my needs.

13     Q.      This was the schedule available to meet your

14  needs that was given to you at the hiring hall?

15     A.      Yes.  My teaching hour needs.

16     Q.      So your schedule for the 2015-2016 school year

17  was effectively finalized at the hiring hall, correct?

18     A.      When does that mean?

19     Q.      That your schedule was decided on at the hiring

20  hall.  This was the date that it was locked in?

21     A.      Right.  But, you know, things change.

22     Q.      I'm sorry?

23     A.      Things change.

24     Q.      Right.  I'm saying at the time when you signed to

25  accept this schedule for the 2015-2016 schedule that was

K.  WALD

1    expected to be your schedule for the 2016 school year?

2         A.     Yes.

3         Q.     Okay.  I want you to turn to paragraph 15 of

4    Exhibit A, which is your complaint in this action.

5    Paragraph 15 states that the DOE was aware that Ms.  Wald

6    was unable to perform this assignment and she caught

7    pneumonia three times the prior school year due to the

8    schedule but still refused to accommodate her request for

9    an assignment with a full-time schedule, morning and

10   afternoon, which was closer to home or more compact in

11   time.  Now how was the DOE aware that you were unable to

12   perform a schedule that you had just decided upon at the

13   hiring hall?

14        A.     Well they were contacted by Mr. Brewton, okay.

15   At the time of the hiring hall I didn't know that I was

16   going to ask for an accommodation.  But before the school

17   year started they were notified by Mr. Brewton.

18        Q.     I'm saying at the time how would the DOE have

19   been aware that you were unable to perform the assignment

20   that you signed up for at the hiring hall?

21        A.     Well this doesn't say at the time of the hiring

22   hall.

23        Q.     So the DOE would not have been aware that you

24   were unable to perform your schedule?

25        A.     At the time of the hiring hall.

K.  WALD

1      Q.      Correct.

2      A.      Correct.   I didn't know that either.

3      Q.      When you agreed on the schedule at the hiring

4   hall, you didn't know that you were going to need an

5   accommodation; is that right?

6      A.      That's correct.

7      Q.      Paragraph 16 of your complaint you allege that

8   you were forced out on leave on December 9, 2015,

9   constructively terminated due to the DOE's failure to

10   provide you with reasonable accommodations.   How were you

11   forced out on leave on December 9, 2015?

12      A.      Are we talking about the word forced?

13      Q.      I'm asking you how you were forced out.

14      A.      I left because I couldn't get an accommodation

15   that worked for me and I didn't have any other option but

16   to leave.   I couldn't take the travel time for four days

17   and the medical accommodation was not granted.   So if your

18   unwilling to negotiate then what choice do I have?

19      Q.      So who are you alleging led you to require?

20      A.      The DOE was not giving me the medical

21   accommodation.

22      Q.      Anyone in particular from the DOE?

23      A.      Okay.   So based on my experience as chapter

24   leader, okay.   I know that Ms. Mills, okay, makes the final

25   decisions about everything.

89

K. WALD

1      Q.      So you're alleging that it is Ms. Mills who was

2    the reason behind your retirement?

3      A.      I'm presuming.

4      Q.      Who were your supervisors at the Brooklyn Adult

5    Learning Center?

6      A.      Kesha Harris.

7      Q.      Did you have any problems with Kesha Harris?

8      A.      No.

9      Q.      Did you get along with Ms. Harris?

10     A.      As well as anyone else got along with her.

11     Q.      Did she ever state that you needed to take

12   medical leave?

13     A.      I was the chapter leader.  I represented all the

14   teacher's.  Whenever there was an issue with anything, we

15   didn't go to the principals; we went to Ms. Mills.

16     Q.      The question I'm asking is, did Ms. Harris ever

17   state to you that you needed to take medical leave or

18   retire?

19     A.      I never discussed it with her.

20     Q.      You also worked at the Alternative Education

21   Complex in Manhattan on West 35 Street.  Who was your

22   supervisor there?

23     A.      I can't remember her name.

24     Q.      Did she ever state to you that you needed to take

25   medical leave?

90

K. WALD

1     A.     No.  She didn't.  But I'm sure all the

2  discussions took place with Ms. Mills, okay.  The only

3  thing that you would go to a regional principal was for an

4  observation.  Any other issue was handled by Ms. Mills.

5     Q.     Did you ever insist that you take medical leave?

6     A.     No.

7     Q.     So it was your choice to take medical leave on

8  December --

9     A.     I didn't take medical leave.

10    Q.     I'm sorry.  Excuse me.  It was your choice to

11  take terminal leave on December 9, 2015?

12    A.     Correct.  Given the alternative, what choice did

13  I have?

14    Q.     Your saying the alternative of working the

15  schedule that you were assigned to?

16    A.     Correct.

17           MR. REITER:  Mark this exhibit, please.

18           (Whereupon, a document was marked as

19           Defendant's Exhibit I for identification as of

20           this date by the Reporter.)

21    Q.     All right.  Ms. Wald, I'm handing you what's been

22  marked Exhibit I. Do you recognize this document?

23    A.     Yes.

24    Q.     Is that your signature under the signature of the

25  applicant?

K. WALD

1      A.      Yes.

2      Q.      The date is November 9, 2015?

3      A.      Right.

4      Q.      This document is your application for retirement

5   leave of absence terminal leave?

6      A.      Correct.

7      Q.      So you submitted the application on November 9,

8   2015; is that right?

9      A.      Yes.

10     Q.      So this was the application for you to retire

11   from the Department of Education?

12     A.      Correct.

13     Q.      Why did you decide to retire from the Department

14   of Education?

15     A.      Because I was terrified of working four days from

16   7:30 to 9:30 and then on Friday for those hours.  I didn't

17   want to get sick again.

18     Q.      Did anyone attempt to deny you terminal leave

19   when you applied for it in your application for retirement

20   leave?

21     A.      No one can deny you.  It's not a Board of

22   Education policy where they can deny you terminal leave.

23     Q.      All right.  Now in your complaint you allege that

24   you're aware of others who were provided requested change

25   of their schedules despite only needing these changes for

K.  WALD

1    convenience, not serious medical complications.   Who are

2    these individuals that you are referring to?

3         A.    Irene Rosa was the chapter leader and resigned

4    soon after she became chapter leader.   She went back to her

5    original schedule.

6         Q.    So she became the chapter leader on June 30,

7    2015?

8         A.    July 1.

9         Q.    July 1, 2015?

10        A.    '16.   No, no.   '15 you're right.

11        Q.    And you're saying that she resigned from the

12   chapter leader position?

13        A.    Yes.

14        Q.    When did she resign?

15        A.    I don't know the exact date.

16        Q.    During the 2015-2016 school year?

17        A.    Yes.   She served four or six months, a half a

18   year.

19        Q.    Do you know why she resigned from that position?

20        A.    As far as I know, she was not happy.

21        Q.    Okay.   So after she resigned from that position

22   what happened to her schedule to the best of your

23   knowledge?

24        A.    She went back to her original schedule.

25        Q.    What was her original schedule?

K. WALD

1    A.    She taught ESL in Mid-Manhattan.

2    Q.    So she was teaching in Mid-Manhattan but just had

3    the six hour union duties; is that correct?

4    A.    Yes.

5    Q.    And then after she resigned from the chapter

6    leader position are you testifying that she worked 30 hours

7    at the location in Mid-Manhattan location?

8    A.    As far as I know.  I'm not 100% sure but I'm

9    pretty sure.

10   Q.    What's the basis for your belief that she went

11   back to her original schedule?

12   A.    The teacher's told me.

13   Q.    What class to the best of your knowledge did she

14   take over at the Mid-Manhattan school?

15   A.    I don't know that.  The teacher's told me that

16   she went back to her schedule.

17   Q.    So she picked up to the best of your knowledge

18   the six hours that she had for union duties?

19   A.    Yes.

20   Q.    What teacher's at the Mid-Manhattan location told

21   you that she added six hours back to her schedule?

22   A.    I can't remember the names.  But I was a very

23   active, involved chapter leader so the teacher's called me

24   all the time.  I knew a lot.  I worked very hard.  I was

25   well informed.  So the teacher's call me all the time with

94

K. WALD

1    issues and problems and circumstances.

2         Q.    And to the best of your knowledge when was her

3    schedule reverted back to the schedule she had in the

4    2014-2015 school year?

5         A.    During the first year of her being chapter

6    leader.

7         Q.    Are you aware of any other individuals who were

8    provided schedule changes that they requested?

9         A.    Lisa Miller.  I think who had worked in the Bronx

10   and she worked in Brooklyn.  I think her schedule was

11   changed.

12        Q.    Why to the best of your knowledge was her

13   schedule changed?

14        A.    I was told that she had a son and getting home

15   very late, at night, coming from Brooklyn.  She got home

16   really really late.

17        Q.    Did you know Lisa Miller personally?

18        A.    Yes.  I did know her.

19        Q.    Did you talk to her about her schedule change?

20        A.    I can't remember if I did or not.

21        Q.    Do you know Irene Rosa?

22        A.    Yes.

23        Q.    Did you talk to her about her schedule change

24   being reverted back to the previous schedule in the 2014-

25   2015 school year?

95

K. WALD

1    A.    No.  I didn't.  But the teacher's told me.

2    Q.    Right.  But I'm saying just specifically your

3  conversation with Ms. Rosa?

4    A.    No.

5    Q.    You didn't speak to Ms. Rosa?

6    A.    No.

7    Q.    Was what Lisa Miller's job title when she

8  requested the schedule change?

9    A.    She was an ESL teacher.

10    Q.    An ESL teacher for Adult Education?

11    A.    Yes.

12    Q.    And what was Irene Rosa's position when she

13  requested the schedule change?

14    A.    She was an ESL teacher.

15    Q.    Both Lisa Miller and Irene Rosa were ESL

16  teacher's for the Adult Education Program?

17    A.    Yes.

18    Q.    Do you know of any other individuals who were

19  requesting schedule changes during the 2015-2015 school

20  year?

21    A.    I know Jeff Schwartz.  Not during the year, he

22  left at the end of the summer.  He went to a different

23  program.

24    Q.    Outside of Adult Education?

25    A.    Yes.  And then there was a problem getting him

K. WALD

1    released.   And then there was Gina, I think, and I think

2    she had an accident, and I think her program was changed.

3    I think some teacher's from the Queens school told me this.

4    I didn't have a conversation with Gina at that time.

5         Q.      So let's go back.   So Gina you said requested a

6    schedule change because she had an accident?

7         A.      I think so.   That's what the teacher's told me.

8         Q.      Do you know if Gina -- what's her last name?   I'm

9    sorry.

10        A.      Foschinti (phonetic) or something like that.

11        Q.      Do you know if Gina requested a schedule change?

12        A.      If she got a schedule change I'm sure it was

13   because she requested it.   Because I remember she had very

14   difficult program because I worked with all the teacher's

15   making the programs before I ended my tenure as the chapter

16   leader.

17        Q.      And you said Jeff Schwartz?

18        A.      He left the program.

19        Q.      So he didn't request a schedule change?

20        A.      He had a problem getting released but he finally

21   got released.

22        Q.      Okay.   But that's not a request for a schedule

23   change, it was a request to leave the program itself?

24        A.      For a different schedule at another place.

25        Q.      Within Adult Education?

K.  WALD

1      A.      No.

2      Q.      Do you know of any other individuals who made

3  medical accommodation requests during the 2015-2016?

4      A.      No.

5      Q.      Are there any other individuals that you're aware

6  of who made schedule request changes that were granted

7  during the 2015-2016 school year other than the ones that

8  we have just discussed?

9      A.      I don't know.  But that doesn't mean it wasn't

10 done.

11     Q.      To the best of your knowledge?

12     A.      Right.

13             MR. REITER:  Mark this exhibit, please.

14             (Whereupon, spreadsheet e-mail was marked as

15             Defendant's Exhibit J for identification as of

16             this date by the Reporter.)

17     Q.      I'm showing you what has been marked as

18 Defendant's Exhibit J.  Do you recognize this document?

19     A.      No.  But it has my name on it but I can't recall

20 seeing it.

21     Q.      It's written by Patty Crispino; is that correct?

22 Take a second to read it and then let me know when you have

23 read this.

24     A.      Okay.

25     Q.      All right.  Now in this e-mail states that there

K.  WALD

1    is a spreadsheet that shows classes and Ms. Wald's license

2    that existed in 5/4/14 and what was created for the start

3    of 2015 school year.  Do you have a copy of this

4    spreadsheet that's referred to in the e-mail?

5        A.    No.

6        Q.    Do you know of the classes that are referred to

7    in this e-mail?

8        A.    No.  This is what she was probably given during

9    the Summer of 2015.  Why do I say that?

10       Q.    Yes?

11       A.    Because it says these are jobs that were added

12   after the placement center.

13       Q.    Right.  Were you ever informed of what those jobs

14   were?

15       A.    I didn't have access.  Maybe she said she sent it

16   to me and I didn't see it.  I don't know.  I can't recall.

17   This dates that there was a possibility of accommodation

18   for me after the placement center.  That's the gist of this

19   letter.

20       Q.    Right.  But you requested an accommodation in

21   August 2015?

22       A.    This letter is December '15, right.

23       Q.    Yes.

24       A.    And the spreadsheet comes out in September,

25   October of 2015.

99

K.  WALD

1      Q.      The spreadsheet that's referred to here?

2      A.      Yes.  As far as I know they had to come out with

3      the teacher's and who got positions where they were and

4      what was available and when the jobs opened.  So the

5      spreadsheet was after I was chapter leader, which I was no

6      longer privy to.  She might have sent it to me.  She sent

7      it to Allen Lichte and Crespo (phonetic) they handle level

8      two grievances.

9      Q.      I'm just asking do you have a copy of this

10     spreadsheet that's referred to in this e-mail, correct?

11     A.      Maybe.  She sent it to DOE and I don't know if I

12     still have access to that e-mail.  Here it says the

13     positions are indicated in the listing in the PDF

14     directory, positions are retired or transferred after the

15     placement center.

16     Q.      Do you have any idea of these position that are

17     referred to in this e-mail were available at the time you

18     made your accommodation request?

19     A.      I don't know.

20     Q.      All right.

21     A.      I also know that there are teacher's that retire

22     throughout the year.  They don't always retire at the end

23     of the year.  In fact when I retired, the teacher right

24     next to me, three teacher's retired within two months of my

25     leaving.

K. WALD

1        Q.       So they required after you had retired?

2        A.       Soon after.  Very soon after.  So during the year

3    2015-2016 I don't know who was -- I know teacher's right

4    where I worked but I don't know in other schools if they

5    were retiring as well.

6        Q.       Now in your complaint you allege that the

7    Department of Education discriminated against you in

8    violations of the Americans with Disabilities Act.  What is

9    the basis for your belief that the Department of Education

10   discriminated against you on the basis of your disability?

11       A.       I asked for an accommodation, okay, for heath

12   reasons and I have not been given one.

13       Q.       Okay.

14       A.       And I believe that since the final decision ended

15   with Ms. Mills, okay, that it would be very difficult.

16       Q.       So are you alleging that they didn't give you an

17   accommodation because of your leukemia?

18       A.       It could have been a combination of because of my

19   leukemia, yeah, I guess.  Why wouldn't they give me an

20   accommodation?

21       Q.       You said a combination of leukemia --

22       A.       They didn't give it to me because of my leukemia.

23       Q.       Now you also allege that the Department of

24   Education failed to provide you with a reasonable

25   accommodation, which caused you to prematurely retire.

K. WALD

1   What accommodation did the Department of Education fail to

2   provide you?

3       A.      They reduced my working hours.  They wanted to

4   reduce my working hours.

5       Q.      So what accommodation did they fail to provide

6   you?

7       A.      To give me a schedule where I wouldn't have to

8   take a reduction in pay.

9       Q.      Now your requirement was effective February 1,

10  2016, correct?

11      A.      Correct.

12      Q.      Where were you planning on retiring initially?

13      A.      Probably two or three years later.

14      Q.      Now you allege that if the Department of

15  Education had accommodated you, you would still be working.

16  Could you have taken the reduced schedule and continued

17  working?

18      A.      It would have had a dramatic impact on my

19  pension.

20      Q.      Okay.  So are you saying that you didn't want to

21  take the reduction in your schedule because it would impact

22  your pension?

23      A.      Correct.

24      Q.      How would it impact your pension?

25      A.      How would it have impacted?

K. WALD

1    Q.    Yes.

2    A.    It's six hours.  It's 1/6 of my salary.

3    Q.    So it would have affected the long-term pension

4  benefits that you received?

5    A.    And it was a decision that I had to make in the

6  matter.  I had an illness and who knows what can happen

7  with my illness.

8    Q.    If the Department of Education had provided you

9  with the accommodation that you are alleging was denied,

10  would you have continued working for the Department of

11  Education?

12    A.    As long as I was feeling well, absolutely.

13    Q.    Were you feeling well at the time that you

14  retired?

15    A.    I was tired because of the schedule.  But if they

16  had accommodated me with the schedule, I'm sure, I believe

17  that I could have managed.

18    Q.    So it was really the night hours that were the

19  primary issue for you?

20    A.    No.  It was the 7:30 to 9:30 all day for four

21  days.

22    Q.    Okay.

23    A.    It wasn't the night.  I could have worked at

24  night, okay.  It was just that -- you're not sick.  I'm

25  sure that you work 7:30 to 9:30 four days a week, right.

K. WALD

1   You're much younger, right.  Eventually when you get older,

2   you would be tired, okay.  So anyone would be tired but I

3   have a condition that could tolerate the stress less and

4   more venerable to infections and things like that.  So it

5   was not a wise decision for me to keep that up given the

6   respiratory infections I had the year before.

7       Q.    So what is a schedule that would have allowed you

8   to receive the accommodation that you needed?

9       A.    I described something before.  If I worked, you

10  know, two nights then I would have space for two

11  afternoons, right.  Two days, three, four and I could go to

12  sleep at 4:00 and then wake up at 7:30 the next day.  In

13  the case I couldn't go to sleep at all.  I couldn't eat

14  well because if I only had an hour and I had a drop

15  something off and run out, I was running.  I wasn't eating

16  well; I wasn't resting; I wasn't regaining my strength.  So

17  that wears you out.

18      Q.    So it was two of those long days instead for four

19  of those longs days, you're testifying that would have been

20  more able to perform your job?

21      A.    Say it again?

22      Q.    If it was two of those long days that you would

23  do, 7:30 to 9:30, if it was two of those days as opposed to

24  four days, are you alleging that you would have been able

25  to perform your job with the Department of Education?

K. WALD

1    A.    You mean if I worked the 36 hours for two days

2    and then rested three days?

3    Q.    Yes.

4    A.    Yes.  I mean that wasn't a choice.  But it's just

5    so I have time to rest in between.  The schedule that I

6    had, I had time to rest.  I had no time to eat well for

7    four days and I had no time to rest.

8    Q.    You also allege that the Department of Education

9    retaliated against you because you made a request for a

10   reasonable accommodation.  How did the Department of

11   Education retaliate against you?

12   A.    Where is that?

13   Q.    That would be on page 6 of 8 and paragraph 26.

14   A.    Okay.  How did they retaliate against me?  I'm

15   sure that they had less incentive to grant me this

16   accommodation then they might have had with any other

17   teacher because I was an active chapter leader.

18   Q.    Are you saying they retaliated against you by not

19   granting you accommodation because of the fact that you

20   were previously a chapter leader?

21   A.    I know that Ms. Mills did not want me to have

22   those hours.

23   Q.    Right.  But I'm saying is there a specific action

24   that you took that you're alleging the Department of

25   Education retaliated against you for taking?

K. WALD

1      A.      I believe that she didn't want to pay me those

2   six hours, that was her problem for all of the arbitrations

3   and for all of the teacher's and that she was very happy to

4   take away those six hours.

5      Q.      You're stating that the Department of Education

6   retaliated against you for the previous grievance that you

7   filed with respect to the six hours --

8      A.      There was a reason for them not to accommodate

9   me.

10     Q.      So you're alleging that this is a retaliation for

11  that particular grievance?

12     A.      Yes.  I believe that this was -- well that she

13  didn't want to accommodate me.  I don't know why but she

14  didn't want to accommodate me for health and for past

15  activities.

16     Q.      When you say past activities, what are you

17  referring to?

18     A.      Union activities.

19     Q.      Any union activities in particular?

20     A.      You can go down the list.

21     Q.      What is the most recent union activity that you

22  would say is retaliated against you?

23     A.      She didn't want to accommodate me, okay.  She

24  never spoke to me, okay.  I believe that, I don't know,

25  given that someone is sick and right, you can handle that.

K. WALD

1    The other chapter leader who left, she has nothing wrong;

2    they gave her back her job.  She didn't give me back my job

3    that I could work with.  She worked with the other chapter

4    leader to accommodate her.  I don't know why she didn't

5    work with me to accommodate me.

6         Q.    Have you ever received unemployment insurance

7    benefits?

8         A.    Not in the last 20 years.

9         Q.    When did you receive unemployment insurance

10   benefits?

11        A.    I don't remember.  Not since 2001.

12        Q.    What was the reason that you received those

13   benefits?

14        A.    I guess I was unemployed at that time.

15        Q.    Do you know how much money you received?

16        A.    I don't recall.  I couldn't tell you the years or

17   anything.

18        Q.    Have you ever received workers' compensation?

19        A.    No.

20        Q.    Have you ever received welfare or public

21   assistance or any benefits of any kind?

22        A.    No.

23        Q.    So you previously testified that you're not

24   currently working, correct?

25        A.    That's correct.  Or let's say I'm not employed.

K.  WALD

1    Q.    Are you claiming that you suffered damages as a

2    result of Defendant's alleged discrimination and

3    retaliation against you?

4    A.    Yes.

5    Q.    What damages do you claim you have suffered as a

6    result of the defendant's actions?

7    A.    I wasn't planning on retiring so financial

8    damages.

9    Q.    So how much are you requesting in damages in this

10   case?

11   A.    Well I guess if I worked for two to three more

12   years from -- let's start at 2015.  I work for a half the

13   year, right, 2015, 2016, 2017.  So at least two more years'

14   salary.

15   Q.    What was your salary at the time you retired?

16   A.    $126,000.

17   Q.    So you're claiming that you would have earned

18   $126,000 in salary over the next --

19   A.    I would have earned more than that because the

20   union -- I'm not quite sure, they had changes based on a

21   new salary.  I think the following year it would have gone

22   up to 12.5% for that and then another year I don't know,

23   what, so 12.5% is 1/8 of 12 --

24   Q.    It's okay.

25   A.    12 divided by 8 is one and a half, right.  So

K. WALD

1   $15,000 more.

2       Q.      Are you claiming any other damages other than the

3   salary that you would have earned over the next three

4   years?

5       A.      I wasn't happy not to have the job.

6       Q.      But you decided to retire, correct?

7       A.      As I said I couldn't sustain that schedule.

8       Q.      Okay.

9       A.      And I was willing to because I was taking

10  chemotherapy.   The drugs are very expensive.   Why would I

11  do something so stupid?

12      Q.      Are you claiming emotional distress damages in

13  this case?

14      A.      Not excessive but I was aggravated that they

15  didn't give me my job.   I was upset about that.

16      Q.      What mental anguish or emotional distress are you

17  claiming as a result of the actions of the Department of

18  Education?

19      A.      I didn't have mental anguish.   I was upset, okay.

20  I wasn't distraught.

21      Q.      So you were upset?

22      A.      I wasn't distraught.   I could function.

23      Q.      Did you ever seek any counseling for any

24  emotional distress damages?

25      A.      No.

K. WALD

1    Q.    Are you taking any medication in regard to any

2    emotional distress that you may have suffered?

3    A.    No.

4    Q.    Did you talk to anyone about any emotional

5    distress that you have suffered?

6    A.    I was angry.   I might have told someone that I

7    was angry that they didn't accommodate me, that I had to

8    leave.

9    Q.    Prior to your termination with the Department of

10   Education what other source of stress did you have in your

11   life?

12   A.    Say it again?

13   Q.    Prior to your retirement from the Department of

14   the Education in 2015, what other sources of stress did you

15   have in your life?

16   A.    Well I worked hard in a difficult program, right.

17   And I had to achieve it.   So the job was stressful but it

18   has its benefits and everyone has stress all the time.   I

19   had to clean my house every week.   No one looks forward to

20   that.

21   Q.    So besides what you've told me, have you

22   experienced any other emotional distress damages?

23   A.    I wish that I would have been there to help some

24   of my students get their high school diplomas.   They

25   contacted me outside after I retired to help them.   I still

K.  WALD

1    have ongoing relationships that could have been more

2    effective had I been there.   And they can state that.   And

3    that is a regret.

4         Q.    In your complaint you also allege that you're

5    seeking a rescission of your resignation; is that correct?

6         A.    Yes.

7         Q.    So you no longer want to be retired from the

8    Department of Education?

9         A.    I could go back.  I don't know.  I'll see what

10   happens.  I didn't know when I wrote this how long this

11   would take to be resolved.

12        Q.    But I'm saying at the present moment, you wish to

13   rescind your resignation from the Department of Education?

14        A.    Yes.

15        Q.    What is the basis of your request to rescind your

16   resignation or your retirement from the Department of

17   Education?

18        A.    Let's put it this way.  If I wanted to go back to

19   work, I wanted to know the possibility that I could.  I

20   don't know as a full-time teacher, what.  But I'd like to

21   know that I have the possibility to go back to work should

22   I wish.

23        Q.    If you were able to rescind your resignation, how

24   would that affect your pension benefits?

25        A.    If I was able to rescind it?

K.  WALD

1    Q.    Yes.

2    A.    Well, maybe not rescind but have the option to

3    work.  I can work even though I'm retired.

4    Q.    Has the Department of Education prevented you

5    from working for them in any way?

6    A.    I can't work in this program.  She will never

7    hire me.

8    Q.    But have you applied to work in this program

9    since you retired?

10    A.    No.

11    Q.    Have you applied to work in any other program for

12    the Department of Education since you retired?

13    A.    No.  Because my expertise is in this program but

14    she would never hire me in this program.

15    Q.    But you've never actually been denied a position

16    with the Department of Education?

17    A.    Based on my prior history with her and based on

18    the chapter's prior history with her and based on this

19    lawsuit and based on her personality, I would never get the

20    job.

21    Q.    My question is, you have not applied for a

22    position with the Adult Education Program since you

23    retired?

24    A.    I don't jump into -- I'm trying think of a good

25    example.  Based on the information that I gave you, I did

K. WALD

1    not apply.

2        Q.       The question is yes or no.   Have you applied with

3    the office of Adult Education with the Department of

4    Education since you retired?

5        A.       That's correct.

6        Q.       Is it your contention that you are physically

7    able to work right now?

8        A.       As I discussed in the beginning, yes, there are

9    certain positions, yes, I can work.   Depending on the

10   requirements of the job, etc.

11       Q.       What has changed since you retired that now that

12   you now feel you are able to work?

13       A.       I'm taking chemotherapy.   The drugs cost a

14   fortune.

15       Q.       So you feel in better shape now than you did at

16   the time you retired?

17       A.       Thank god.

18       Q.       Have you ever declared bankruptcy?

19       A.       No.

20       Q.       Have you ever been convicted of a crime?

21       A.       No.

22       Q.       Have you ever plead guilty to a crime?

23       A.       No.

24       Q.       Have you ever been arrested?

25       A.       No.

K.  WALD

1      Q.      Have you ever at any time been accused of

2   discriminating against another person?

3      A.      No.

4      Q.      Have you ever at any time been accused of

5   retaliating against another person?

6      A.      No.

7      Q.      Other than in this lawsuit, have you ever accused

8   anyone of retaliating against you?

9      A.      What does that mean?

10      Q.      Have you ever filed any lawsuit alleging that

11   someone has retaliated against you?

12      A.      Based on what?

13      Q.      Anything?

14      A.      I don't recall anything, no.

15      Q.      Have you ever filed another lawsuit prior to this

16   lawsuit?

17      A.      Yes.

18      Q.      What lawsuit was that?

19      A.      I can't remember.  I'm sure I filed a lawsuit.  I

20   filed a lawsuit in small claims court.  I can't remember

21   but I know I filed lawsuits.

22      Q.      When was that lawsuit filed?

23      A.      100 years ago.  My landlord didn't have a stove.

24   He had to give me a stove.

25      Q.      So you filed a lawsuit in small claims court

K. WALD

1    about a stove?

2        A.      Yes.

3        Q.      Have you filed any other lawsuits?

4        A.      I'm sure I have.

5        Q.      Have you ever filed a lawsuit in State court?

6        A.      Probably.   But I haven't filed a lawsuit in 20

7    years.

8        Q.      Do you recall what the lawsuit you filed was

9    about in State court?

10       A.      No.

11       Q.      Was it against Department of Education?

12       A.      No.

13       Q.      Have you ever filed a lawsuit other than this

14   lawsuit that we're for today against the Department of

15   Education?

16       A.      No.

17       Q.      Have you ever filed another lawsuit alleging that

18   someone discriminated against you in any court of law?

19       A.      No.   As far as I can remember.

20       Q.      Now aside from this lawsuit, do you believe that

21   you've ever been discriminated against in your entire life?

22       A.      Sure.   Me too, right.

23       Q.      Are you alleging that the Department of Education

24   has ever discriminated against you before?

25       A.      I filed a lot of grievances, right.   That went to

K. WALD

1    arbitration.   Does that constitute discrimination?

2        Q.      Did you ever allege in your grievances that the

3    Department of Education discriminated against you?

4        A.      Yes.

5        Q.      When?

6        A.      For the union activities.

7        Q.      You allege that you were retaliated against for

8    union activities.   When did you file that grievance?

9        A.      That was a 2007 grievance for the extra hours.

10       Q.      Can you explain what the nature of that grievance

11   was?

12       A.      There were, as far as I remember, several

13   teacher's, okay.   There was a concern about the way the

14   contract was written about teacher's:   How to use your work

15   schedule 30 but the contract said that they could work

16   additional hours and that if they worked those additional

17   hours, they would be paid pro rata not per session.   Do you

18   understand the difference?

19       Q.      Can you explain the difference?

20       A.      Pro rata is whatever your hourly wages is at this

21   time; if you're a full-time teacher, you would get back the

22   additional hours.   Per session is a $42, $43 fee.   So there

23   are many many teacher's that filed -- there were two --

24   there were actually three grievances, and the second

25   grievance I participated in.   And lots of teacher's -- I

K. WALD

1   think there are 26 teacher's at the time, and the teacher's

2   union -- the teacher's won that.  So a lot of the teacher's

3   that had worked those additional hours received pro rata

4   versus per-session pay.  And that took about three years to

5   resolve.  So then the following year when all of teacher's

6   got their new schedule, worked the additional hours and got

7   the pro-rata pay, my schedule was changed such that I

8   couldn't have the additional hours anymore.  I was the only

9   one out of the original 26 teacher's whose schedule was

10  changed, arranged, so that I couldn't have those hours.  No

11  one else's.  And that's the one that was resolved in April

12  of 2015.  They said that I was entitled to them, that there

13  was harassment and it set a precedent that all of the other

14  teachers who added additional hours to their work schedule

15  were entitled to the pro rata pay.

16      Q.      Aside from that grievance, did you ever allege

17  any grievance that the Department of Education retaliated

18  against you?

19      A.      I don't recall but this one was a big one.

20      Q.      Did you ever fill any grievances alleging that

21  the Department of Education had discriminated against you

22  in any way?

23      A.      This went to arbitration.  I don't know if it was

24  dissemination.  The OACE didn't give me 30 hours.  They

25  wouldn't give me a full-time program, so I went to work one

K. WALD

1    year in the day school.   Then it went to arbitration and

2    they had to give me a 30 hour program after that.

3        Q.    When was that?

4        A.    2006, 2007.   I don't know.

5        Q.    Have you ever testified either in court or at a

6    deposition such as the one that you're here for today?

7        A.    Not that I recall.

8        Q.    To the best of your knowledge this is the first

9    deposition that you've ever appeared for?

10       A.    Correct.   Arbitration is not a deposition?

11       Q.    No.   But you've appeared for arbitrations before?

12   What arbitrations have you appeared for?

13       A.    As I said, I was the chapter leader so several.

14       Q.    Specifically which arbitration?

15       A.    Well I named the two.   One is pro rata, the pro

16   rata was twice.   The one was with my full-time job.   There

17   was one for religious observance.   There were many

18   arbitrations, okay.   Many many cases as chapter leader.   An

19   exceedingly number of cases at OACE, not all started by me

20   but as the chapter leader, I was the person there.

21       Q.    Were you a witness at the arbitrations as the

22   chapter leader?

23       A.    I don't know what you mean by that.   I don't know

24   if I was a witness.   I have testified to certain things.

25       Q.    So you testified as a chapter leader even though

K. WALD

1  you were not the one --

2      A.      Might have been applicable to my case even though

3  I wasn't participating in the case.

4      Q.      So even though you didn't bring the case, you

5  were still testifying at the case?

6      A.      Not often but at times, yes.

7      Q.      You said you were an Adult Education Teacher from

8  2006 up until you retired?

9      A.      Well I started 2001 and then I took off a year

10  and went to a different program and then I came back.

11      Q.      What year, you said --

12      A.      One is in 2015.

13      Q.      What program was that again?

14      A.      It was a detention center.  I was the master

15  teacher in a suspension center.

16      Q.      What is a suspension center?

17      A.      The DOE would take all these unruly first through

18  sixth graders and put them in a suspension center and then

19  they try to work with them there, get them out of the

20  classroom.

21      Q.      So you worked there for one year and that was the

22  gap.  Otherwise you were at the Adult Education Program

23  from 2001 up until your retirement?

24      A.      Yes.

25      Q.      Did you work for the Department of Education

K. WALD

1    through the duration of the 1990s as well?

2        A.     No.

3        Q.     Where did you work?

4        A.     I worked in business.  I went to business school.

5        Q.     So you came back to the Department of Education

6    in 2001?

7        A.     Correct.

8        Q.     How many years in total have you worked for the

9    Department of Education?

10       A.     25 years.

11       Q.     So you worked from 2001 until your retirement and

12   what years did you work for Department of Education other

13   than the years of 2001 to 2016?

14       A.     I worked there in the early 70s, then I worked

15   there I think -- I don't know how many, one or two years.

16   I don't remember.  In the 80s, then the early 90s and then

17   the late 90s.  That accumulated to 25 years.

18              MR. REITER:  Can we take a brief break?

19              MS. KAPITONOVA:  Sure.

20       Q.     Ms. Wald, did you have notes or any recordings of

21   anything that we talked about today?

22       A.     Only that e-mail that you said you didn't see.

23       Q.     That's pretty much it.  We're going to keep the

24   deposition open if there are any documents that have not

25   been turned over, that have not been produced that you were

K.  WALD

1    not aware of, if we could ask questions about those

2    particular documents.   We will keep this deposition open.

3    Otherwise after this transcript is prepared, I'll send it

4    to you through counsel.   I'm going to ask that you review

5    the transcript and if there are any errors, you have the

6    opportunity to correct those errors at that time.   Do you

7    understand?

8                    THE WITNESS:   Yes.

9                    MS. KAPITONOVA:   Yes.

10       Q.     Do you have any questions for me?

11       A.     As far as what?

12       Q.     Are there any questions that you did not

13   understand here today?

14       A.     I don't think so.

15   EXAMINATION BY

16   MS. KAPITONOVA:

17       Q.     Ms. Wald, you testified that Ms. Mills gave a

18   teacher the counseling job over you even though you were a

19   tenure teacher, correct?

20       A.     That was in 2015-2016 semester.

21       Q.     Do you believe that the DOE retaliated against

22   you by not giving you a better schedule because of

23   reasonable accommodations disability request?

24       A.     Yes.

25       Q.     Is it your testimony today that have you received

K.  WALD

1    the reasonable accommodation you would not have retired

2    early, correct?

3        A.      Absolutely correct.

4               MS. KAPITONOVA:   That will be all.   Thank you.

5                   (Whereupon, at 1:35 P.M., the Examination of

6               this Witness was concluded.)

7

8                    o            o            o            o

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K. WALD

1          D E C L A R A T I O N

2

3          I hereby certify that having been first duly

4   sworn to testify to the truth, I gave the above testimony.

5

6          I FURTHER CERTIFY that the foregoing transcript

7   is a true and correct transcript of the testimony given by

8   me at the time and place specified hereinbefore.

9

10

11

12                    _____
                              KAREN A. WALD

13

14

15   Subscribed and sworn to before me

16   this _____ day of _____ 20___.

17

18

19   _____
        NOTARY PUBLIC

20

21

22

23

24

25

K.  WALD

1                        E X H I B I T S

2

3      DEFENDANT EXHIBITS:

4

5      EXHIBIT        EXHIBIT                            PAGE

6      LETTER         DESCRIPTION

7      A              Complaint                          4

8      B              Accommodation request              35

9      C              Hardship application               48

10     D              ADA form                           51

11     E              Letter                             63

12     F              Schedule                           71

13     G              E-mail                             78

14     H              Schedule form                      85

15     I              Terminal leave form                90

16     J              Spreadsheet e-mail                 97

17

18

19                    (Exhibits retained by Counsel.)

20

21                         I N D E X

22     EXAMINATION BY                                    PAGE

23     MR.  REITER                                       4

24     MS.  KAPITONOVA                                   120

25

K.  WALD

1               INFORMATION AND/OR DOCUMENTS REQUESTED

2    INFORMATION AND/OR DOCUMENTS                    PAGE

3    Production of e-mails                           12

4    Production of e-mails                           13

5    Production of documents                         40

6

7

8

9               QUESTIONS MARKED FOR RULINGS

10   PAGE LINE    QUESTION

11   (None)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K. WALD

1                        C E R T I F I C A T E

2

3      STATE OF NEW YORK        )
                               :   SS.:
4      COUNTY OF SUFFOLK        )

5

6              I, DANIELLE KAASTRA, a Notary Public for and

7      within the State of New York, do hereby certify:

8              That the witness whose examination is

9      hereinbefore set forth was duly sworn and that such

10     examination is a true record of the testimony given by that

11     witness.

12             I further certify that I am not related to any

13     of the parties to this action by blood or by marriage and

14     that I am in no way interested in the outcome of this

15     matter.

16             IN WITNESS WHEREOF, I have hereunto set my hand

17     this 26th day of February 2018.

18

19

20     _____

                DANIELLE KAASTRA

21

22

23

24

25