# ORIGINAL

1

2   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK

3   ------------------------------------------X
    KAREN WALD,

4
                                 PLAINTIFF,

5

6        -against-              Case No.:
                                17 CV 3560

7                               (WFK)(VMS)

8

    THE DEPARTMENT OF EDUCATION OF THE CITY OF

9   NEW YORK, and THE CITY SCHOOL DISTRICT OF
    THE BOARD OF EDUCATION OF THE CITY OF NEW

10  YORK,

11                               DEFENDANTS.
    ------------------------------------------X

12

13                    DATE:   April 10, 2018

14                    TIME:   10:29 A.M.

15

16            DEPOSITION of the Defendant, THE

17  DEPARTMENT OF EDUCATION OF THE CITY OF

18  NEW YORK, by a Witness, ROSE-MARIE MILLS,

19  taken by the Plaintiff, pursuant to a Court

20  Order and to the Federal Rules of Civil

21  Procedure, held at the offices of Stewart

22  Lee Karlin Law Group, P.C., 111 John

23  Street, 22nd Floor, New York, New York

24  10038 before Erika Olsson, a Notary Public

25  of the State of New York.

```
 1

 2     A P P E A R A N C E S:

 3

 4     STEWART LEE KARLIN LAW GROUP, P.C.
          Attorneys for the Plaintiff
 5        KAREN WALD
          111 John Street, 22nd Floor
 6        New York, New York 10038
          BY:   NATALIA KAPITONOVA, ESQ.
 7

 8
       ZACHARY W. CARTER, ESQ.
 9     CORPORATION COUNSEL
       NEW YORK CITY LAW DEPARTMENT
10        Attorneys for the Defendants
          THE DEPARTMENT OF EDUCATION OF THE CITY
11        OF NEW YORK, and THE CITY SCHOOL DISTRICT
          OF THE BOARD OF EDUCATION OF THE CITY OF
12        NEW YORK
          100 Church Street
13        New York, New York 10007
          BY:   JUSTIN REITER, ESQ.
14

15              *          *          *

16

17

18

19

20

21

22

23

24

25
```

```
 1
 2      F E D E R A L   S T I P U L A T I O N S
 3
 4
 5      IT IS HEREBY STIPULATED AND AGREED by and
 6   between the counsel for the respective
 7   parties herein that the sealing, filing and
 8   certification of the within deposition be
 9   waived; that the original of the deposition
10   may be signed and sworn to by the witness
11   before anyone authorized to administer an
12   oath, with the same effect as if signed
13   before a Judge of the Court; that an
14   unsigned copy of the deposition may be used
15   with the same force and effect as if signed
16   by the witness, 30 days after service of
17   the original & 1 copy of same upon counsel
18   for the witness.
19
20      IT IS FURTHER STIPULATED AND AGREED that
21   all objections except as to form, are
22   reserved to the time of trial.
23
24              *      *      *      *
25
```

1                    R. MILLS

2       R O S E M A R I E    M I L L S, called as a

3       witness, having been first duly sworn by a

4       Notary Public of the State of New York, was

5       examined and testified as follows:

6       EXAMINATION BY

7       MS. KAPITONOVA:

8            Q.      Please state your name for the

9       record.

10           A.      Rose-Marie Mills.

11           Q.      What is your address?

12           A.      475 Nostrand Avenue, Brooklyn,

13      New York 11216.

14           Q.      Good morning.   My name is

15      Natalia Kapitonova, and I represent Karen

16      Wald in connection to allegations that she

17      has against the Department of Education.

18      Before we start, I would like to explain

19      the deposition process to you.   I'll be

20      asking you a couple of questions with

21      regard to your knowledge about plaintiff's

22      alleged incidents.   The court reporter

23      sitting right here to my left, she will be

24      transcribing your answers.   For this

25      reason, I ask you to please give me verbal

```
 1                    R.  MILLS
 2   answers to whatever I ask you.  If you
 3   don't understand something, wait until I
 4   finish the question and you can ask me to
 5   rephrase the question.  But don't do any
 6   physical expressions like nodding, etc.,
 7   because she won't be able to transcribe it
 8   for the record.  I remind you that at all
 9   times you remain under oath, and your
10   testimony could be used later in the
11   proceeding.  Understand that if you lie
12   today, you will be committing perjury.  If
13   at any time you don't understand one of my
14   questions like I said before, answer the
15   best you can, and I will rephrase it.  Wait
16   until I finish speaking before you answer
17   any questions.  Now, from time to time your
18   attorney may object to one of my questions.
19   If he does, unless your attorney instructs
20   you otherwise, you should answer my
21   question.  If you need a break during the
22   deposition, please let me know.  Is
23   everything clear?  Do you have any
24   questions for me right now?
25          A.     No.
```

```
 1                  R. MILLS
 2        Q.    Have you ever had taken your
 3   deposition before?
 4        A.    No.
 5        Q.    This is the first time anyone
 6   has deposed you?
 7        A.    First deposition I've had.
 8        Q.    Do you understand that your
 9   testimony even though in an informal
10   setting here as in an office, has the same
11   force and effect as if we were in court?
12        A.    Yes.
13        Q.    Is there any mental or physical
14   reason as to why you wouldn't be able to
15   give me accurate and truthful answers to my
16   questions today --
17        A.    No.
18        Q.    Please wait I finish my
19   question.  Thank you.  Are you currently
20   taking any medication?
21        A.    Yes.
22        Q.    What are you taking?
23              MR. REITER:  You can answer.
24        A.    I take metformin, Januvia,
25   lisinopril.  Um.
```

```
 1                    R. MILLS
 2         Q.      Anything else?
 3         A.      There are others, but I can't
 4    recall their names right now.
 5         Q.      Okay.   What is the purpose for
 6    this medication?   Where are you taking
 7    these medications?
 8         A.      History of diabetes,
 9    hypertension, cholesterol.
10         Q.      Okay.   Anything else?
11         A.      No.
12         Q.      Is there any medication that
13    you should have taken today but didn't?
14         A.      No.
15         Q.      Before coming in today, did you
16    discuss to anyone about the fact that you
17    would be deposed today?
18         A.      Yes.
19         Q.      With whom?
20         A.      The attorney.
21         Q.      Anyone else?
22         A.      No.
23         Q.      How long was your discussion
24    with your attorney?
25         A.      I can't recall the time.
```

R. MILLS

1

2     Q.     Okay.   Have you ever reviewed

3  any documents before coming in today?

4     A.     Yes.

5     Q.     Which documents?

6     A.     I reviewed the documents with a

7  communication with Mr. Brewton.   I reviewed

8  an e-mail regarding Irene Pavan Rosa.

9  That's all I reviewed.   Those are two that

10  I can recall.

11     Q.     Okay.   The first one you said a

12  document about Mr. Brewton.   Is that what

13  you said?

14     A.     Yes.   That's what I said.

15     Q.     What kind of document was that?

16     A.     An e-mail.

17     Q.     What was the e-mail regarding?

18     A.     It was regarding Ms. Wald's

19  request for accommodation.

20     Q.     And you said that you reviewed

21  another e-mail, correct?

22     A.     I said I reviewed an e-mail

23  regarding a communication regarding Irene

24  Rosa.

25     Q.     What was the e-mail about?

1                         R. MILLS

2          A.      Irene Rosa.

3          Q.      I know, but what?

4          A.      About Irene Rosa, and what

5     happened when she gave up her position as

6     the UFT chapter chair.

7                   MS. KAPITONOVA:   Okay.  So, may

8              the record reflect that this e-mail

9              was turned to plaintiff's attorney by

10             the defendant's attorneys,

11             approximately 15 minutes before this

12             deposition started today.

13             Plaintiff's attorney has not had a

14             full opportunity to review it yet,

15             but she has seen the e-mail and it's

16             in her possession right now.

17         Q.      Have you ever been sued before?

18         A.      I don't know.

19         Q.      Has someone ever called you to

20    appear in court before?

21         A.      I have gone to matters

22    regarding the DOE, but I don't know if it

23    was me being sued, or I went as a

24    representative of the department.  But I've

25    never gone to court per se.

```
1                    R.  MILLS
2          Q.      When you described those
3   matters, what kind of matters are these?
4          A.      Various matters.   Matters
5   regarding teachers, or other employees.
6   Maybe disciplinary, maybe people who were
7   terminated.   Matters of that.
8          Q.      Okay.   Any matters against you?
9          A.      Against me?
10         Q.      Yes.
11         A.      Not that I'm aware.   I know the
12  department.
13         Q.      So just to be clear, you have
14  never been involved in a judicial
15  proceeding before, correct?
16         A.      With the Department of
17  Education is that what you're asking me?
18         Q.      No.   I'm asking you if you've
19  ever been involved in any judicial
20  proceeding?
21         A.      I've gone to court if that's
22  what you're asking me.
23         Q.      Yeah.   I asked you that
24  previously when you said no.   So tell me
25  about that when you went to court.
```

```
 1                    R.  MILLS
 2          A.      I've gone to court on personal
 3     matters.
 4          Q.      Yes.  Tell me when was that.
 5          A.      I don't think I want to talk
 6     about that today.  I think that's my
 7     privileged information that has nothing to
 8     do with this proceeding, if I had gone to
 9     court.  I'm here to represent the
10     Department of Education, and that's all I'm
11     here to do.
12          Q.      I understand, but you have to
13     answer my questions.  And if there's an
14     objection, your attorney has to make the
15     objection, the attorney that's representing
16     the Department of Education.  So other than
17     that, you should answer my questions.  So,
18     again I'm asking you if you've ever been in
19     court, tell me when and for what.
20          A.      I don't recall when I went to
21     court.  I went to court for traffic stuff.
22          Q.      Okay.  And that's on personal
23     matters, correct?
24          A.      Yes.
25          Q.      Okay.  Any other instance in
```

```
 1                    R.  MILLS
 2    which you've been in court for personal
 3    matters?
 4          A.     I had a lawsuit against a
 5    furniture company many, many years ago that
 6    I went to court for.
 7          Q.     How many years ago was that?
 8          A.     I don't recall.
 9          Q.     Okay.  Do you remember in what
10    court was that?
11          A.     It was in Brooklyn.
12          Q.     Okay.  Were you suing the
13    furniture company, or were you being sued
14    by the furniture company?
15          A.     I was suing them.
16          Q.     For what?
17          A.     For damaged furniture.
18          Q.     Okay.  What was the outcome of
19    that lawsuit?
20          A.     They judge ruled in my favor,
21    so they had to replace it.
22          Q.     Okay.  What else?  Any other
23    lawsuits or courts?
24          A.     Not that I can recall.
25          Q.     Okay.  I just remind you that
```

```
1                    R. MILLS
2     any court public proceeding is a public
3     record, and that you're under oath.  If you
4     don't answer for some reason, it would be
5     perjury.  I just remind you about the rules
6     of the deposition.  What about for the
7     Department of Education?  Have you been in
8     court before for the Department of
9     Education?
10           A.     Never.
11           Q.     How many times have you been in
12    court for traffic violations approximately?
13           A.     One or two.
14           Q.     How long ago was that?
15           A.     I can't recall.
16           Q.     Anything else regarding that?
17           A.     No.
18           Q.     So tell me what is your
19    educational background.
20           A.     Master's in School
21    Administration.
22           Q.     What year?
23           A.     I don't remember.
24           Q.     Okay.  Any other degrees that
25    you have?
```

1                    R.  MILLS

2          A.    I have a Bachelor's in

3    Education.

4          Q.    Okay.   Were where did you

5    obtain your master's?

6          A.    Fordham University.

7          Q.    What about your bachelor's?

8          A.    University of West Indies.

9          Q.    Where is this university?

10          A.    Jamaica.

11          Q.    Do you hold any other degree?

12          A.    No.

13          Q.    Okay.   Are you currently

14    employed at this time?

15          A.    Yes.

16          Q.    Where?

17          A.    New York City Department of

18    Education.

19          Q.    When did you start working for

20    the DOE?

21          A.    I think over 23 years ago.

22          Q.    Okay.   When you started, what

23    was your position?

24          A.    Teacher.

25          Q.    What do you teach?

1                          R.  MILLS

2          A.      Math.

3          Q.      Where?

4          A.      I.S. 90.

5          Q.      Where is that located?

6          A.      Washington Heights.

7          Q.      Do you recall approximately

8   what year was that?

9          A.      No.

10         Q.      What other school did you work?

11         A.      I worked as an assistant

12   principal at M.S. 52.

13         Q.      Where is that located?

14         A.      Bronx.

15         Q.      And, after that?

16         A.      I worked as a principal at M.S.

17   222, and M.S. 343.

18         Q.      Okay.   Where is M.S. 222

19   located?

20         A.      Bronx.

21         Q.      What about M.S. 343?

22         A.      Bronx.

23         Q.      And, after that?

24         A.      I worked with central DOE.

25         Q.      Okay.   Where?

```
 1                        R.  MILLS
 2        A.     Citywide.
 3        Q.     What year was that?
 4        A.     I don't recall.
 5        Q.     All right.   How long did you
 6   work there?
 7        A.     How long did I work?
 8        Q.     How long did you work there at
 9   central DOE?
10        A.     Maybe over two years.
11        Q.     Okay.   And, after that?
12        A.     I was a superintendent of
13   District 19.
14        Q.     Where is District 19 located?
15        A.     Brooklyn.
16        Q.     Okay.   How long were you a
17   superintendent for District 19?
18        A.     Two-plus years.
19        Q.     Okay.   Anything else after
20   that?
21        A.     Superintendent of adult
22   education.
23        Q.     Where is that?
24        A.     Citywide.
25        Q.     Are you currently working
```

```
1                        R. MILLS

2       there?

3            A.     Yes.

4            Q.     How long have you been holding

5       this position?

6            A.     Six-plus years.

7            Q.     Who hired you for this

8       position?

9            A.     The deputy chancellor.

10           Q.     What's his name?

11           A.     Her name.

12           Q.     What's her name?

13           A.     Dorita Gibson.

14           Q.     Do you know where she's from?

15           A.     I don't understand your

16      question.

17           Q.     If you know, what's her

18      nationality?

19                  MR. REITER:   Objection.

20           Q.     If you don't know, just say you

21      don't know.  I don't know if you know or

22      not.

23           A.     I don't know.

24           Q.     How is your relationship with

25      Dorita Gibson?
```

```
 1                    R.  MILLS
 2        A.    She's my supervisor.
 3        Q.    Do you have any other
 4   relationship with her besides work
 5   relationship?
 6        A.    No.
 7              MR.  REITER:   Objection.
 8        Q.    So, as superintendent of the
 9   adult program, tell me your
10   responsibilities.
11        A.    Supervise all aspect of the
12   program across the city.
13        Q.    Anything else?
14        A.    No.
15        Q.    When you say supervise all
16   aspects of the program, what do you mean by
17   that?  Explain to me.
18        A.    Everything.
19        Q.    What is everything?
20        A.    Everything.
21        Q.    I want you to explain what
22   everything means.
23        A.    Everything means all aspects of
24   the program.
25        Q.    What are the aspects of the
```

```
 1                    R.  MILLS
 2    program?
 3         A.      The operation, the funding of
 4    the program, the hiring of the supervisors,
 5    principals for the program.
 6         Q.      Anything else as part of your
 7    job responsibilities?
 8         A.      No.
 9         Q.      Who do you supervise?
10         A.      Principals, employees of my
11    central office.
12         Q.      Okay.   What kind of employees?
13         A.      Budget operation, data
14    management.
15         Q.      Anything else?
16         A.      No.
17         Q.      Is Dorita Gibson your current
18    supervisor?
19         A.      My direct interaction is with
20    Laura Feijoo.
21         Q.      Spell her last name for me.
22         A.      F-E-I-J-O-O.
23         Q.      What's her position?
24         A.      Supervising superintendent.
25         Q.      So you report directly to her?
```

```
1                       R.  MILLS
2          A.     Yes.
3          Q.     Anyone else that you report to?
4          A.     No.
5          Q.     How long has she been your
6    supervisor?
7          A.     Since I started.
8          Q.     How long is that?
9          A.     Six-plus years.
10         Q.     How is your relationship with
11   Ms.  Feijoo?
12         A.     With who?
13         Q.     Laura Feijoo.   The supervisor
14   Laura --
15         A.     Feijoo.
16         Q.     Yes.
17         A.     Supervisor and subordinate.
18         Q.     So you only have a work
19   relationship?
20         A.     Correct.
21         Q.     Do you know the plaintiff in
22   this case, Karen Wald?
23         A.     Yes.
24         Q.     How do you know her?
25         A.     I met her when I came into
```

1                      R.  MILLS

2      adult ed.

3              Q.      And that was six-plus years

4      ago?

5              A.      Yes.

6              Q.      How is your relationship with

7      Ms.  Wald?

8              A.      Cordial.

9              Q.      Do you socialize with her

10     outside of work?

11             A.      No.

12             Q.      Do you have any difficulties in

13     your working relationship with her?

14             A.      No.

15             Q.      To your knowledge, has Ms.  Wald

16     ever made any complaints to anyone about

17     you?

18             A.      I think possible.

19             Q.      What kind of complaints, and to

20     whom?

21             A.      Ms.  Wald is a chapter chair.

22     So, if there's disagreement between the

23     stance of the chapter and the department, I

24     guess she would complain.

25             Q.      Right, but I'm not asking you

```
 1                    R.  MILLS
 2    to guess.  I'm asking you if you know if
 3    she ever complained about you.
 4          A.    I don't know.
 5          Q.    Has Ms. Wald ever been involved
 6    in an arbitration with you?
 7          A.    Yes.
 8          Q.    What kind of arbitration was
 9    that?  For what?
10          A.    I don't recall what it's about.
11    I just know there were arbitrations, and I
12    have gone to arbitrations, and she was also
13    involved.  The nature of which ones, I
14    can't recall at this time.
15          Q.    How many arbitrations have you
16    been involved with Ms. Wald, approximately?
17          A.    I can't guess.  I don't know.
18          Q.    Say more than ten or less than
19    ten?
20          A.    Less than ten.
21          Q.    More than five or less than
22    five?
23          A.    I don't know.
24          Q.    And you don't recall the nature
25    of the complaints, correct?
```

```
 1                      R. MILLS

 2          A.     No, I don't.

 3          Q.     Do you recall the outcome of

 4      the arbitrations?

 5          A.     No.

 6          Q.     Have you ever been disciplined

 7      by the Department of Education?

 8          A.     No.

 9          Q.     How did your relationship with

10      Ms. Wald after she was involved in

11      arbitrations with you?

12               MR. REITER:   Objection.

13          A.     I didn't have a change of

14      relationship with Ms. Wald.   The

15      relationship was the same.

16          Q.     Okay.  Has anyone working in

17      the Department of Education ever made a

18      complaint against you?

19          A.     Yes.

20          Q.     Who?

21          A.     Teachers.

22          Q.     Tell me their names.

23          A.     I don't recall.

24          Q.     How many complaints have they

25      made against you?
```

```
1                        R.  MILLS
2          A.     I don't know.
3          Q.     Can you give me an approximate?
4          A.     No.
5          Q.     Why not?
6          A.     Those complaints don't come to
7    me.
8          Q.     They come to who?
9          A.     They go to maybe my supervisor,
10   or depends on where they make the
11   complaint.   Different venues for
12   complaints.
13         Q.     Who informs you of whether or
14   not someone has made a complaint against
15   you.
16         A.     Who informs me?
17         Q.     Yes?
18         A.     Depends on what the complaint
19   is or where it came from.
20         Q.     Well in this instance, tell me
21   who informed you about the complaints?
22         A.     Various people could inform me
23   about the complaints.   It depends on where
24   the person filed the complaint.   So
25   depending on it, then the source of the
```

```
 1                    R.  MILLS
 2    complaint would be somebody who may reach
 3    out to me.  Or, if it's a complaint through
 4    investigations, the investigator will come
 5    and meet with me during the course of an
 6    investigation.
 7         Q.    Okay.  Give me some names of
 8    people that have informed you about
 9    complaints made against you.
10              MR. REITER:   Objection.
11         A.    I don't know.  I can't recall.
12         Q.    Okay.  What's the nature of
13    these complaints?
14              MR. REITER:   Objection.
15         A.    I can't recall.
16         Q.    Has anyone ever claimed
17    discrimination against you?
18         A.    I don't know.
19         Q.    Do you know if you don't say
20    the truth today it's perjury, correct?
21         A.    I know that.
22         Q.    Okay.  I have to ask you
23    questions.  Okay?
24         A.    Yeah, and I have to answer.
25         Q.    I know.  I'm asking you
```

```
 1                    R.  MILLS
 2     questions.
 3           A.     Yeah,  and I'm answering.
 4           Q.     Has anyone ever complained
 5     retaliation against you?
 6           A.     I don't know.
 7           Q.     What was Ms.  Wald's position at
 8     the DOE?
 9           A.     Teacher,  and she was a UFT
10     chapter chair for a number of years.
11           Q.     What did she teach?
12           A.     Basic education.
13           Q.     Do you know how long has Ms.
14     Wald worked for the DOE?
15           A.     No.
16                  (Whereupon,  complaint was
17              marked as Plaintiff's Exhibit 1 for
18              identification as of this date by the
19              Reporter.)
20           Q.     Okay.   I'm going to show you
21     what has been marked Plaintiff's Exhibit 1.
22     Do you recognize this document?
23           A.     Yes.
24           Q.     What is this document?
25           A.     Karen Wald plaintiff,  versus
```

```
 1                    R.  MILLS
 2    the DOE.  That's what it is.
 3         Q.     Is this a complaint of this
 4    lawsuit?
 5         A.     I don't know.  I guess so.  I
 6    don't know.
 7         Q.     Please read it.
 8              MR. REITER:  Take a look.
 9         Q.     Take a look at the document,
10    and then I'll ask you questions about it.
11              MR. REITER:  Read the document.
12          Once you've finished reviewing it,
13          let her know.
14              MS. KAPITONOVA:  Off the
15          record.
16              (Whereupon, an off-the-record
17          discussion was held.)
18         Q.     Before the break, I showed you
19    what's been marked Exhibit 1.  You have
20    time to examine the document.  Can you
21    please tell me what is this document.
22         A.     That's a suit by Karen Wald
23    against the DOE.
24         Q.     Is this a document that you
25    will identify as the complaint in this
```

1                         R.  MILLS

2     lawsuit?

3            A.     Yes.

4            Q.     Okay.  So I point your

5     attention to paragraph four of the

6     complaint.  It's on page three.  Okay.  Do

7     you know of any medical problems or

8     physical or mental limitations Ms. Wald

9     claimed to have?

10           A.     I read this document, and from

11    what it says, it says she has leukemia and

12    respiratory disease.

13           Q.     But before you saw this

14    document were you aware of plaintiff's

15    disability?

16           A.     No.  I didn't know what her

17    illness is.

18           Q.     Did you ever ask Ms. Wald what

19    was her illness?

20           A.     We never had an opportunity to

21    discuss her illness.

22           Q.     What was your understanding of

23    what her medical problems were before you

24    read this document today?

25           A.     I had no understanding of what

```
 1                      R.  MILLS
 2    her medical problem is.  That was not
 3    shared with me.
 4         Q.     So just to be clear.  You never
 5    learned about her medical problems before
 6    today?
 7         A.     No.  I didn't, no.
 8                MR. REITER:   Objection.
 9         A.     No.  When I read this document,
10    that's when this document was first shared
11    with me, and I read it.  That's when I knew
12    what her ailments are.
13         Q.     Right.  But my question was,
14    before you were showed the complaint, you
15    never learned about her medical problems,
16    correct?
17         A.     Correct.
18         Q.     When was the complaint shown to
19    you the first time?  Approximately.
20         A.     I don't know when.  I guess
21    when the attorney, I guess, forwarded it to
22    me.  I don't remember when.
23         Q.     Since that time, you know about
24    the medical problems of Ms. Wald?
25         A.     Yes.
```

```
1                          R.  MILLS
2          Q.     Now, I point you to paragraph
3   eight of the complaint.  I believe it's on
4   page three.
5                  MR. REITER:  Yes.
6          Q.     Okay.  Do you know that in the
7   summer of 2015, Ms.  Wald began
8   chemotherapy?
9          A.     No.  I did not until I read
10  this document.
11         Q.     So again, just to make sure.
12  Before you read this complaint, you had no
13  idea that Ms. Wald was in chemotherapy?
14         A.     No.  I had no idea.
15         Q.     Do you speak to Ms.  Wald about
16  this?
17         A.     No.
18         Q.     Why not?
19         A.     Because Ms.  Wald never shared
20  or discussed it with me.
21         Q.     So you never engaged in any
22  conversations with Ms.  Wald regarding her
23  illness, correct?
24         A.     Correct.
25         Q.     So do you know what a
```

                         R.  MILLS

1

2    reasonable accommodation request is?

3        A.    I have a broad sense of what it

4    is.

5        Q.    So tell me what's your

6    understanding of that.

7        A.    When somebody may have an

8    ailment, and they want some adjustments to

9    be made based on that.

10       Q.    Okay.  What is the DOE policy

11   regarding a reasonable accommodation?

12       A.    The person files that through I

13   guess the medical unit, or some other unit,

14   and they review it, and make the decisions.

15       Q.    Okay.  To your knowledge, did

16   Ms. Wald ever made a reasonable

17   accommodation request?

18       A.    I think she did.

19       Q.    When was that?

20       A.    I don't know, because it wasn't

21   with me.

22            (Whereupon, accommodation

23            request form was marked as

24            Plaintiff's Exhibit 2 for

25            identification as of this date by the

```
 1                    R.  MILLS
 2          Reporter.)
 3          Q.     Okay.  So I'm showing you now
 4    what has been marked as Plaintiff's Exhibit
 5    2 for identification.  Take a moment to
 6    review it.  Do you recognize this document?
 7          A.     No.
 8          Q.     What is this document?
 9          A.     This is a accommodation request
10    form.
11          Q.     Made by who?
12          A.     Karen Wald.
13          Q.     Okay.  Have you ever seen this
14    document before?
15          A.     No.
16          Q.     Is this the first time you see
17    this document?
18          A.     Yes.
19          Q.     What is your role in regard to
20    the reasonable accommodations?  Do you have
21    any role whatsoever?
22          A.     I guess a consultary role.  I
23    really don't make the final decision.
24    There's a special office that does that for
25    the DOE.
```

```
1                    R. MILLS
2        Q.    So you don't make any decision
3   whatsoever about reasonable accommodation?
4        A.    I'm not the say-so on that.
5        Q.    Has anyone ever been in contact
6   with you regarding Ms. Wald's reasonable
7   accommodation?
8        A.    Yes.  Mr. Brewton.
9              MR. REITER:  That's
10        B-R-E-W-T-O-N.
11             THE REPORTER:  Thank you.
12        Q.    Okay.  Who else?
13        A.    That's it.
14        Q.    So do you make any decision in
15   regards to these requests?
16        A.    I don't make the final
17   decision.
18        Q.    My question is, if you made any
19   decision regarding this, notify any
20   decision?
21        A.    I spoke to Mr. Brewton when he
22   contacted me, and I didn't make any
23   decision.  I told -- I gave him some
24   options, some possibilities.  He makes the
25   final decision.  His office.
```

```
 1                    R.  MILLS

 2        Q.      So when he contacted you

 3   regarding Karen Wald's reasonable

 4   accommodation request, what did he say?

 5        A.      He said Ms. Wald made this

 6   request about something nearer to home, I

 7   spoke to him on the phone, I explained he

 8   needed to get an understanding of how adult

 9   education works.  I explained to him how

10   classes are created, etc.  And, I explained

11   to him that the current schedule that Ms.

12   Wald had, had her working more than the

13   mandated time, which was by her choice.

14   And then I also advised him that based on

15   availabilities around, we didn't have any

16   day program that could meet the request as

17   is.  And that if Ms. Wald wanted to reduce

18   her workload, and still remain a full-time

19   teacher, that could be something that we

20   could look into.

21        Q.      When did this conversation take

22   place approximately?

23        A.      I would have to look at the

24   e-mail.  I don't recall.

25        Q.      Was it before you saw the
```

1                    R.  MILLS

2    complaint?

3         A.    Yes.

4         Q.    So before you saw the

5    complaint, you knew that Ms. Wald made a

6    reasonable accommodation request?

7         A.    Yes.  I knew she made a

8    request.

9         Q.    But you never knew why,

10   correct?

11        A.    I don't know the details.  I

12   just know that she wanted something closer

13   to home.

14        Q.    But you never read the

15   accommodation request form?

16        A.    No.  That was never shared with

17   me.

18        Q.    Did you request it?

19        A.    No.

20        Q.    So you discussed about it, but

21   you never requested the document.  Is that

22   correct?

23        A.    That's not my place to review

24   the request.  As I shared with you, my

25   conversation was more about what scheduling

```
 1                    R.  MILLS
 2    in adult ed is, and what our possibilities
 3    within adult education.
 4         Q.    Is it part of your job
 5    responsibility to review reasonable
 6    accommodation requests?
 7         A.    No.
 8         Q.    Okay.  So, before you make the
 9    determination about scheduling, do you
10    review the request?
11              MR. REITER:   Objection.
12         A.    There is scheduling and
13    accommodation have nothing -- I don't --
14    they're not linked.  I'm not responsible
15    for accommodation requests.  So that, I'm
16    going to repeat, I don't.  There's a unit
17    in the DOE that handles accommodation
18    requests.  They contact me and asked me
19    about adult ed programing and
20    possibilities.  I shared that information
21    with them, and that's the extent of what I
22    know.
23         Q.    Okay.  So, if you look at
24    Exhibit 2.  There's a box indicated
25    disability, limitations and job functions
```

                    R.  MILLS

1

2    unable to perform.   Can you please read for

3    the record what this box state.

4         A.      "Chronic lymphocytic leukemia

5    on oral chemotherapy daily, decrease work

6    commute as P -- I think it says patient is

7    fatigued and at high risk for infection

8    with stressed schedule."

9         Q.    Is today the first time that

10   you read this box?

11        A.    Yes.

12        Q.    Okay.   There is another box

13   below that says detail description of

14   accommodation request.   Can you please read

15   it for the record.

16        A.      "Reduce time travel with

17   position closer to home, on job hours more

18   conducive to adequate rest, decrease stress

19   and absences at work allow for MD visits in

20   her free time."

21        Q.    Is today the first time you

22   read this box?

23        A.    Yes.

24        Q.    Okay.   When was this

25   accommodation request, requested?   What was

```
 1                    R. MILLS
 2   the date of this?
 3        A.     On this document it says
 4   8/26/2015.
 5        Q.     Thank you.  For the two boxes
 6   that you read, does anywhere does it say
 7   that Ms. Wald is requesting less hours?
 8        A.     The second box says reduce
 9   travel time with position or job hours for
10   conducive to adequate person stress.
11        Q.     Does it say that she's
12   requesting less hours?
13        A.     Not directly.
14        Q.     So the answer is no?
15        A.     All right.
16        Q.     You tell me.
17        A.     I guess it's no.
18             (Whereupon, schedule was marked
19             as Plaintiff's Exhibit 3 for
20             identification as of this date by the
21             Reporter.)
22        Q.     Okay.  I'm showing you now a
23   document that has been marked as
24   Plaintiff's Exhibit 3.  Please review it,
25   and let me know when you've read it.  Tell
```

```
 1                    R.  MILLS
 2    me what is this document?
 3         A.       Teacher's schedule for Karen
 4    Wald.
 5         Q.    Okay.  What's the date of this
 6    document, if it has it?
 7         A.       It says Monday June 29th, 2015.
 8         Q.    Okay.  So is it fair to say
 9    that that's the schedule Karen Wald had in
10    2015, the school year 2014, '15?
11         A.       That will be '15, '16.
12         Q.    Okay.  Thank you.  If you see
13    the document there is a column where it
14    says BALC.  Can you please tell me what
15    that stands for.
16         A.       Brooklyn Adult Learning Center.
17         Q.       Where is this located?
18         A.       Brooklyn.
19         Q.       Where in Brooklyn?
20         A.       475 Nostrand Avenue.
21         Q.       Is that the area of
22    Bedford-Stuyvesant, Brooklyn?
23         A.       Yes.
24         Q.       What about A E Street?
25         A.       35th Street.
```

```
1                    R. MILLS
2         Q.    So, by looking at this exhibit,
3    Ms. Wald was teaching in Bedford-Stuyvesant
4    from Monday through Friday from 9:30 to
5    1:34, and Monday, Tuesday, Wednesdays, and
6    Thursdays in 35th Street, correct?
7         A.    Yes.
8         Q.    And in the free time gap that
9    she has, she had to commute to the other
10   side, correct?
11        A.    Yes.
12        Q.    How many people are normally
13   assigned to teach at different locations in
14   one day?
15             MR. REITER:   Objection.
16        A.    That's varied.
17        Q.    Sorry.  I didn't hear that.
18        A.    We have a couple of hundred
19   sites across the city.  So there's no way I
20   could answer that question with
21   specificity.  It depends on the site.
22   There are some sites where it's one person,
23   and there are some sites there's multiple
24   people.
25        Q.    So, do teachers typically
```

```
 1                    R.  MILLS
 2   travel from borough to borough in one day?
 3          A.    Yes.  It depends.
 4          Q.    Now, who determines that
 5   teacher's schedule?
 6          A.    Teacher's schedule the first
 7   time a teacher starts, it's based on what's
 8   available.  So the school presents a
 9   schedule when they're hired, based on
10   what's available.  After that, the
11   processes at the end of the year, you don't
12   like your schedule, you attend the
13   placement center.  And, with the
14   understanding that you choose from what's
15   available at the placement center.
16          Q.    All right.  So in this
17   situation, did you determine Ms.  Wald's
18   schedule?
19          A.    No.
20          Q.    Do you have any involvement
21   regarding Ms.  Wald's schedule?
22          A.    No.
23          Q.    So, in Ms.  Wald's case, who set
24   up this schedule for her?
25          A.    Ms.  Wald attended -- Ms.  Wald
```

```
 1                    R.  MILLS
 2    at the end of the school year, all teachers
 3    have the opportunity to say if they want to
 4    keep the schedule they have, or if they
 5    want to change it.  Ms. Wald opted to
 6    change the schedule, and if you opt to
 7    change your schedule, it means you go to
 8    the hiring hall.  She opted to change her
 9    entire schedule, and come to the hiring
10    hall.  You can change a part of -- you can
11    opt to change a part, or you can change all
12    of it.  She chose all of it.  She came to
13    the hiring hall.  The rules of the hiring
14    hall as decided by the union and the
15    department, is that people are seen based
16    on seniority order, and all teachers are
17    aware of that.  So whatever classroom means
18    there are, based on seniority order, you'll
19    go in and you look at what's available, and
20    you work to create a schedule.  There are
21    persons there to facilitate of the
22    documentation of what the teacher chose,
23    and the UFT is there to support the
24    teachers in finding something that they
25    want.
```

```
 1                      R. MILLS
 2          Q.      Okay.  So, when did she opt to
 3     change her schedule?
 4          A.      I can't tell you the exact
 5     date.  I think sometime in June as
 6     customary.  Early June an e-mail goes out
 7     to all teachers to say if you want to
 8     change your schedule, etc.  And it was at
 9     that --
10          Q.      June 2015 we're talking about?
11          A.      We're talking June 2015.
12     Beginning of June somewhere around the end
13     of May, or the beginning of June, all
14     teachers will get this e-mail blast about
15     placement center.  Make a decision who
16     wants to go, with the understanding if you
17     decide that you want to give up a part of
18     your program, your name is going to be
19     removed, and it's going to be left to
20     something free.  And Ms. Wald responded
21     stating that she was given up all of her
22     program that she had the year before, to
23     come to the hiring hall.
24          Q.      Right.  But if you look at
25     Exhibit 2, the reasonable accommodation by
```

```
 1                    R. MILLS
 2   Ms. Wald was made in August of 2015,
 3   correct?
 4         A.    Yes.
 5         Q.    And that's before document 3
 6   right, which is --
 7         A.    No.
 8               MR. REITER:   Objection.
 9         Q.    Is that after?
10         A.    That's after.
11         Q.    Okay.  So then after she made
12   the accommodation request, was her schedule
13   changed?
14         A.    No.  She chose her schedule.
15   This is a schedule she chose at the hiring
16   hall.  This reasonable accommodation
17   request was made after the hiring hall.  So
18   Ms. Wald chose this schedule.
19         Q.    Right.  So, after she made that
20   reasonable accommodation request, on or
21   about August of 2015 was her schedule
22   changed?
23         A.    No.
24         Q.    Why not?
25         A.    It was not changed because what
```

1                      R.  MILLS

2     she wanted, there was no availability at

3     that time.

4          Q.     So if by looking at Exhibit 3,

5     which is Ms. Wald's schedule, is it fair to

6     say that will be terribly harsh for a

7     person with cancer?

8                      MR.  REITER:    Objection.

9          A.     I can't comment on that.

10         Q.     But if you see the reasonable

11    accommodation request, you see that she was

12    trying to reduce travel time, correct?

13         A.     I see that she was trying to

14    reduce travel time, yes.

15         Q.     But you never saw that the

16    request before today, correct?

17         A.     I never saw the request before

18    today.

19         Q.     Okay.  So the reduction in

20    travel time was not granted to your

21    knowledge, correct?

22         A.     I don't know what was proposed,

23    what was sent.  I didn't see the document

24    of what was sent to her, because that's not

25    me.  I don't know who creates these

```
1                    R. MILLS
2    documents.  I don't get this document, I
3    don't respond to this document, I don't
4    know what was actually proposed by that
5    office to her.
6         Q.    By this document, just for the
7    record, you mean Exhibit 2, which is the
8    reasonable accommodation request, correct?
9         A.    Correct.
10        Q.    Okay.  So tell me the person
11   who is responsible for the teacher's
12   schedule in the program.
13        A.    Can you repeat that question.
14        Q.    Who was responsible for the
15   teacher's schedule in the night program?
16        A.    There's nobody really
17   responsible.  I'm not sure I understand
18   what you mean by responsible.  Can you
19   clarify.
20        Q.    Sure.  Of course.  Who makes
21   the schedules for the teachers who teach in
22   the night program?
23        A.    The teachers who teach only in
24   the night?
25        Q.    Yes.
```

```
 1                    R. MILLS
 2          A.      Per session, the schedule for
 3     the entire year is made based on need,
 4     projections, and that's made -- my office
 5     creates that schedule, maybe May, June for
 6     the projection, for the prior year.   And,
 7     after the hiring hall and the placement
 8     center, is the same thing as the hiring
 9     hall.   At the placement center, full-time
10     teachers have the opportunity to come to
11     the placement center.   They indicate before
12     whether they want to change their schedule,
13     and if they choose to change their
14     schedule, they come to the placement
15     center.   After that process is over,
16     whatever classes are not filled in the
17     evening, that's what evening people can
18     apply for.   So there's an application
19     process called precession.   They apply to
20     precession, and based on what people apply
21     for, first people who have retention
22     rights, are first placed.   And then after
23     that, the principals place higher people
24     who applied for the ones that are not
25     retention rights.
```

```
 1                    R. MILLS
 2        Q.    Okay.  So when you said that
 3   your office handles this, who in your
 4   office handles this?
 5             MR. REITER:   Objection.
 6        A.    My data staff who works on the
 7   directory of classes work in tandem with
 8   the principals to determine the
 9   projections.
10        Q.    And under your supervision,
11   correct?
12        A.    Yes.
13        Q.    So, do you have any involvement
14   in how the schedule is made?
15        A.    I have involvement.  I have
16   discussions with principals regarding
17   classes, and the final overview of what
18   classes.  And in particular, if classes are
19   going to be closed, and the reason behind
20   closing the classes.
21        Q.    Okay.  Is it fair to say that
22   you have the final determination as to the
23   -- how the schedule is set?
24        A.    I don't think so.
25        Q.    So, who does?
```

```
 1                    R.  MILLS
 2         A.      There are a number of factors
 3    that contribute to how the schedule is set.
 4    Principal plays a pivotal role, because
 5    unlike the K to 12 system, in adult ed,
 6    it's based on needs, it's based on space
 7    availability.
 8         Q.      I understand that.
 9         A.      So it's back and forth when we
10    look over all on these matters.
11         Q.      But when you mentioned the
12    principal, your job is above the
13    principals?
14         A.      Yes.  I meet with the
15    principals.  The principals, we have eight
16    schools run by eight principals.  And, the
17    principals work with my team to determine
18    what will be -- what kind of classes based
19    on the data trends, what classes should be
20    made available for the next school year.
21         Q.      Are you able to overwrite any
22    of the principal's decisions?
23         A.      Sure I can.
24         Q.      Can they overwrite your
25    decisions?
```

1                          R.  MILLS

2          A.      No, they can't.

3          Q.      So if fair to say if the

4    principals adjust a schedule that you don't

5    think is proper for the program, you will

6    overwrite that decision?

7                  MR. REITER:   Objection.

8          A.      Correct.

9          Q.      So in the case of Ms. Wald, who

10   picked this schedule, as far as you know?

11         A.      She did.

12         Q.      Okay.  Was there any

13   discussions about schedule change?

14         A.      She wrote to me, and said um,

15   she didn't like what she got, but that was

16   what was available.  Something to that

17   effect.  And, that if something should come

18   available.

19         Q.      Okay.  And when was that

20   approximately?

21         A.      I know it was after the hiring

22   hall.  The exact date, I can't tell you.

23         Q.      So after June 2015?

24         A.      Yes.

25         Q.      And that's when she requested a

```
1                      R.  MILLS
2     change of the schedule, right?
3           A.      She asked if anything else
4     became, yes.  For a change of schedule.
5           Q.      What did you respond?
6           A.      I responded to tell her that
7     what she was asking for was not something
8     that was contractual that I could do.
9           Q.      Okay.  Because earlier today
10    you said you didn't have any communications
11    with Ms. Wald, and now you're talking about
12    an c-mail.  Is there any other
13    communications that you had with Ms. Wald?
14          A.      I said I didn't have any
15    accommodation [sic] about an accommodation
16    with her.  That's what I said earlier.
17          Q.      So what do you understand by
18    accommodation then?
19          A.      Accommodation, this document.
20    Exhibit 2.  I didn't have any accommodation
21    about any change of schedule due to any
22    kind of medical situation.  That wasn't the
23    communication.
24          Q.      But she requested a change of
25    schedule --
```

```
 1                    R.  MILLS
 2         A.    She asked --
 3         Q.    Let me finish my question,
 4    please.  So she requested a change of
 5    schedule if it was available to you,
 6    correct?
 7         A.    Yes.  After hiring hall.
 8         Q.    Do you know that Ms. Wald's
 9    requested a decreased work commute because
10    of fatigue, which put her in high risk of
11    infection?
12         A.    Requested, what.
13         Q.    Did you know that Ms. Wald
14    requested a decreased work commute because
15    of the fatigue, which put her at a high
16    risk of infection?
17         A.    I didn't know about anything to
18    do with infection.  I was told that she
19    wanted something that was closer to her
20    house.
21         Q.    Who told you that?
22         A.    Mr. Brewton.
23         Q.    Did anyone else tell you
24    anything about the reduced work schedule in
25    relation to Ms. Wald?
```

```
  1                    R.  MILLS
  2         A.     I didn't hear about a reduced
  3    work schedule from them.   I heard about
  4    something closer to home.
  5         Q.     Okay.   Can a teacher put in a
  6    request for a new schedule?
  7              MR. REITER:   Objection.
  8         A.     Teacher can put in a request,
  9    and anybody can put in a request.
 10         Q.     Who decides the request,
 11    whether it's granted or not?
 12         A.     I would review what the request
 13    is, and I make a decision.
 14         Q.     So you will decide?
 15         A.     Yes.
 16         Q.     Okay.   Besides seniority, which
 17    we spoke about before, is there any other
 18    factor that you use to determine the change
 19    in schedule?
 20         A.     Seniority is not used to
 21    determine the change in schedule.
 22         Q.     What is used?
 23         A.     Seniority is used at the hiring
 24    hall to determine the order in which people
 25    get to make changes.
```

1                    R.  MILLS

2          Q.     So, when a teacher puts a

3     request for a change of schedule to you,

4     you don't take seniority as a factor,

5     correct?

6          A.     It depends on when the teacher

7     is putting in the request.  If the teacher

8     is putting in the request through the

9     placement center process, that's when

10    seniority.  They get seen the order in

11    which everyone who makes that request,

12    that's the time.  The placement center was

13    designed to facilitate requests for change

14    of schedule.  So if a teacher puts in a

15    request through the placement center

16    process, then seniority is what determines

17    the order in which they get to make choices

18    from what is available.  And the order is

19    reviewed with the union to make sure that

20    the teachers are seen in seniority.  That's

21    the correct seniority order.

22         Q.     Okay.  Did anyone on behalf of

23    Ms. Wald ask for a reasonable

24    accommodation?

25         A.     Not to me.

```
 1                    R.  MILLS

 2        Q.     Well you said Mr.  Brewton did,

 3   correct?

 4               MR.  REITER:   Objection.

 5        Q.     You can answer.

 6        A.     You said Mr.  Brewton contacted

 7   me about a request.  If you're saying Mr.

 8   Brewton was acting on behalf of Ms.  Wald,

 9   yes.

10        Q.     So the answer is yes?

11        A.     If Mr.  Brewton was acting on

12   her behalf.

13        Q.     Well Mr.  Brewton approached to

14   you regarding Karen Wald, correct?

15        A.     Yes.

16        Q.     Do you know who is Patty

17   Grispino?

18        A.     Yes.

19        Q.     Who is she?

20        A.     She's a district UFT rep.

21        Q.     Do you know who is Tom Bennett?

22        A.     No.

23        Q.     You never heard of him before?

24        A.     My attorney said that name to

25   me.
```

```
 1                    R.  MILLS
 2              MR.  REITER:   We don't talk
 3         about communications between us, but
 4         you can answer the question.
 5         A.    I don't know him.
 6         Q.    I'm only asking you.   I'm not
 7    asking whoever told you.   If you know who
 8    Tom Bennett is.
 9         A.    No.
10         Q.    So you have never heard of Tom
11    Bennett?
12         A.    No.
13         Q.    Okay.   Did Patty Grispino ever
14    speak to you regarding Ms.  Wald's
15    reasonable accommodation request?
16         A.    No.
17         Q.    She never had a conversation
18    regarding Ms.  Wald?
19         A.    None that I can recall about a
20    request.
21         Q.    So if you had a conversation
22    with Patty Grispino about Ms.  Wald, what
23    was it about?
24              MR.  REITER:   Objection.
25         A.    I don't know what kind of
```

1                    R.  MILLS

2    conversation I had with Patty Grispino.

3    Patty is the district chair.  So, to ask me

4    to recall what I spoke to her about, if I

5    spoke to her about Karen Wald, I can't

6    recall anything about this matter with her.

7    I never spoke to her about this matter.  At

8    the placement center --

9         Q.    I'm asking you only about Patty

10   Grispino right now.

11        A.    That's what I was trying to

12   answer, but I have nothing else to say.

13        Q.    When you said that you did not

14   have a conversation with Ms. Grispino, what

15   do you mean by this matter?

16        A.    About accommodation request.

17        Q.    Just to be clear.  Were you the

18   decision maker whether Ms. Wald got a

19   reasonable accommodation?

20             MR. REITER:  Objection.  Asked

21        and answered.  You can answer the

22        question.

23        A.    I don't make the final

24   determination in an accommodation request.

25   There's a unit in the Department of

```
 1                    R.  MILLS
 2   Education that makes those decisions.
 3        Q.    Do you know any of the doctor's
 4   appointments plaintiff had?
 5        A.    No.
 6        Q.    Did you discuss with plaintiff
 7   about the nature of her medical
 8   appointments?
 9        A.    No.
10        Q.    Do you review any medical
11   evidence submitted by Ms. Wald during her
12   employment, to support the claim of
13   disability?
14              MR. REITER:   Objection.
15        A.    No.
16        Q.    Has Patty Grispino or Tom
17   Bennett ever made you aware that Ms. Wald's
18   assignment created a hardship for her?
19        A.    No.
20        Q.    Okay.  So now I draw your
21   attention to Exhibit 1 again, which is the
22   complaint.  Please look after at paragraph
23   11, which is located on the third page of
24   the document.
25        A.    On the third page.
```

```
 1                    R.  MILLS
 2         Q.    On the third page at the bottom
 3    of paragraph 11.   Okay.   Do you know that
 4    Ms. Wald made an application of hardship
 5    transfer for the same medical reason?
 6         A.    No.
 7         Q.    Do you know what was the
 8    outcome of this application?
 9         A.    I don't know about the
10    application.
11         Q.    Is today the first time that
12    you're learning about the hardship transfer
13    application?
14         A.    Apart from reading it in this
15    document when I first saw it.
16         Q.    So is the answer yes?
17         A.    Yes.
18              (Whereupon, response was marked
19          as Plaintiff's Exhibit 4 for
20          identification as of this date by the
21          Reporter.)
22         Q.    I'm showing you now what has
23    been marked Exhibit 4.   Can you describe
24    for the record what this document is?
25         A.    This is a response to Ms. Wald
```

```
1                      R. MILLS

2    from HR Connect, regarding her request for

3    a medical accommodation.

4            Q.     Okay.   Do you have any

5    involvement with this document?

6            A.     No.

7            Q.     Any involvement with that

8    decision?

9            A.     No.

10           Q.     So draw your attention again to

11   Exhibit 1, which is the complaint.   Please

12   look at paragraph 15, which is located on

13   page four.   Now, let me ask you.   Did you

14   know that during Ms. Wald's job assignment,

15   she caught pneumonia three times?

16           A.     No.

17           Q.     How come you didn't know that?

18           A.     I don't know those things.

19   That's the principal who would be aware of

20   teachers.   And as a superintendent, I don't

21   supervise the teachers, so I don't know who

22   is absent, the reason for the absence.

23           Q.     Okay.   Did you ever inquire

24   about Ms. Wald's health after she made the

25   reasonable accommodation request?
```

```
1                        R.  MILLS

2         A.      No.

3         Q.      Do you know who is Irene Rosa?

4         A.      Yes.  She was the chapter chair

5    after Ms.  Wald.

6         Q.      What other position did she

7    hold for the Department of Education?

8         A.      She was a teacher, and then she

9    became the chapter chair.

10        Q.      Was she provided with her

11   request to schedule change?

12               MR.  REITER:   Objection.

13        A.      There was no request for a

14   schedule change from Ms.  Rosa.   Ms.  Rosa

15   reassigned her position as the UFT chapter

16   chair.   As a UFT chapter chair, you have

17   six hours of non-teaching responsibility.

18   So, if you resign your position as the UFT

19   chapter chair, then you have to be given

20   six more hours of teaching responsibility.

21        Q.      Who gives those hours to her?

22        A.      That's a determination made

23   with the principal based on what's

24   available within the school, or need within

25   the school.
```

```
 1                    R.  MILLS

 2        Q.      When you say it's made with the

 3   principal, you mean you make the

 4   determination with the principal, correct?

 5        A.      The principal and I confer to

 6   say what's available, or is there a need

 7   because she has to be given six more hours

 8   to teach.

 9        Q.      Okay.  Do you know who is Lisa

10   Miller?

11        A.      She was a teacher I think.

12        Q.      Was she provided with her

13   request to schedule changes?

14        A.      Ms.  Miller was teaching in the

15   Bronx, and in adult education.  If you

16   don't have any -- enough students in the

17   class, we close the program.  So, one of

18   her class was closed resulting in her being

19   assigned now, instead of teaching in the

20   evening.  She then requested if she could

21   get something in Brooklyn, and there was an

22   availability for the evening in Brooklyn,

23   and she was given that.

24        Q.      So she was granted her request

25   to the Brooklyn assignment, correct?
```

```
 1                    R.  MILLS

 2        A.    Yes.

 3        Q.    Did she have any medical

 4   illness, to your knowledge?

 5        A.    I don't know.

 6        Q.    Okay.  Tell me what is the

 7   consultation meeting?

 8        A.    That's where the union and the

 9   Department of Education meet and discuss

10   union related matters and concerns.

11        Q.    How often do they occur?

12        A.    Monthly.

13        Q.    Are you involved in these

14   meetings?

15        A.    Yes.

16        Q.    Who conducted the meetings?

17        A.    I guess I conduct the meeting.

18        Q.    What's the purpose of the

19   meeting?

20        A.    Contractual by the union, and

21   the UFT to meet on a monthly basis to

22   discuss any matters or concerns.

23        Q.    It's policy to discuss in the

24   meetings?

25        A.    Yes, sometimes.  Depends.
```

```
 1                     R. MILLS
 2          Q.     Who makes the final decisions
 3   as to policies in those meetings?
 4          A.     Depends on what kind of policy.
 5   We don't make decisions around policies in
 6   the meetings.  That's not a decision-making
 7   body.  The union can request something, and
 8   then it will be taken under advisement, and
 9   depends on what the request is.  It is
10   discussed with the relevant authorities in
11   the DOE in order to make such a decision.
12          Q.     So when you say that the DOE
13   and the UFT attend these meetings, who from
14   the DOE attends these meetings?
15          A.     I attend, principal attends,
16   and the UFT chapter chair, along with other
17   selected members.
18          Q.     Like who?
19          A.     The teachers.  The UFT
20   determines which people.  I think they have
21   selections for delegates or something like
22   that.
23          Q.     Okay.  You're saying that in
24   attendance to these meetings, are you, the
25   principal, UFT chapter chairs, and
```

```
 1                    R. MILLS
 2   teachers.  Anyone else?
 3        A.    If any party chose to invite
 4   somebody because there was going to be a
 5   discussion about a specific matter, also
 6   the district UFT chapter chair, which is
 7   Patty Grispino.  She attends that meeting
 8   too.  And, you know, it depends.  They
 9   could bring other people.
10        Q.    Do any of your superiors attend
11   these meetings?
12        A.    If there's a need, yes.
13        Q.    Like who?
14        A.    Laura may attend, sometimes
15   Karen Solimando, Larry Becker attends.
16        Q.    What are their positions?
17        A.    Larry is an attorney, Karen is
18   in labor relations, and Laura is the senior
19   supervising superintendent.
20        Q.    Okay.  And since when do they
21   attend these meetings?
22        A.    They attend it on an as-needed
23   basis.  So it depends on the matters at
24   hand.  There are other people from the UFT
25   who comes.  The district, I don't know or
```

```
 1                  R. MILLS
 2    the borough person 'comes, Dwayne Clark, now
 3    sometimes Leeroy -- lots of different
 4    people.  I don't know everyone everybody's
 5    name.
 6           Q.    And you said the meetings
 7    happen monthly, correct?
 8           A.    Yes.
 9           Q.    So, how does the placement
10    center work?
11           A.    The placement center.  So,
12    full-time teachers have an opportunity to
13    determine if they want to keep the schedule
14    they have the school year, or if they want
15    to change.  In addition, at the end of the
16    school year, because adult education is
17    reimbursable funding, a review of the
18    classes are done to see if there are
19    classes that we did not have enough persons
20    attended that needed to be a closed.  So
21    you have classes closed at the end of the
22    school year.  And, if your class was
23    closed, you're mandated to go to the hiring
24    hall to choose something else.  And also,
25    teachers can opt to change their full
```

R.  MILLS

1
2    schedule or a part of their schedule.   In
3    order to make those changes, it's
4    facilitated through the hiring hall.   So,
5    usually the day after the last day of
6    school, we have a hiring hall.   The
7    teachers come -- we know ahead of time
8    because we send e-mail communications to
9    say, do you want to go to the hiring hall.
10   And, if you say you want to go to the
11   hiring hall, for what.   Are you changing a
12   part of your schedule, are you changing the
13   entirety of the schedule.   So teachers make
14   those decisions, plus we know the ones
15   whose classes are closed, they get an
16   e-mail to say you're mandated to come to
17   the hiring hall, because this part of your
18   close, your schedule won't be offered next
19   year.   So the directory of class is
20   prepared based on all those things.   And,
21   what the classes that are available are
22   made known.   People come, they have to be
23   -- for all the people who are coming to the
24   hiring hall, we have to sort them by
25   license, and seniority order.   Basically

```
 1                    R. MILLS
 2    three license areas.  Basic education
 3    teachers, ESL teachers, and the CTE
 4    teachers.  Career and Technical Education
 5    teachers.  So they're organized in
 6    seniority order, with the number one person
 7    would be the most senior person.  That mean
 8    you are first to choose from what's
 9    available.  The union reviews the list, and
10    approves the list of the seniority order.
11    And then teachers go in, they usually three
12    diffcrent rooms for the three different
13    licenses.  When one person is finished with
14    their choice, the next person, and it goes
15    on and on.  We have a waited area where we
16    post after somebody makes choices.  We
17    indicate so, so that people know that's
18    gone.  That process continues until
19    everybody gets seen.
20         Q.    Before a teacher goes to the
21    placement center, you know who is going to
22    go, right?
23         A.    Yes.
24         Q.    How long in advance?  Do you
25    know?
```

1                    R.  MILLS

2          A.      Two or three weeks maybe.   I

3     would say about two weeks, because it's --

4     we usually do the responses by the

5     professional development day in June, which

6     I think is the first Thursday in June when

7     they have to reply.   So after that, we get

8     a sense of who are the people coming, and

9     what license.

10          Q.      So, could Ms. Wald apply for

11     job openings after her schedule was

12     changed?

13                    MR. REITER:   Objection.

14          A.      I'm not sure what you mean by

15     job openings.

16          Q.      Well the placement center.

17     Could she go to the placement schedule

18     after her schedule was changed?

19          A.      No.   That's contractually.

20     Contractually you have to go to the

21     placement center because of the seniority

22     issue.   And, what's agreed on with the

23     union, you choose.   And, after that, you

24     can't change your choice.   The only way the

25     choice can be changed is if and which in

1                      R.  MILLS

2     rare opportunities, we have the site is no

3     longer available.

4          Q.     I understand.

5          A.     So, if something happens

6     because we use CVO buildings, we use public

7     schools.  They may say sorry, you don't

8     have the classroom.  Then we have to close

9     that class, reach out to the person and

10    they will look to see what's available and

11    choose from it.  But just saying, I want

12    mine changed afterwards, that's not

13    contractual.

14         Q.     Right.  So, you knew that Ms.

15    Wald went to the placement center, correct?

16         A.     Yes.

17         Q.     When she went, were all the

18    jobs available?

19                MR. REITER:   Objection.

20         A.     All the jobs that we knew about

21    were made available.

22         Q.     Okay.  What about the vacant

23    positions of the retired teachers?  Weren't

24    those available?

25         A.     Vacant positions of retired

```
 1                    R. MILLS
 2   teachers, whose retirement are reflected in
 3   the system, are available.
 4        Q.    Okay.   But at the time Ms. Wald
 5   went to the placement center, were there
 6   any vacant positions for full-time retired
 7   teachers available?
 8              MR. REITER:   Objection.
 9        A.    If they had retired at that
10   time.
11        Q.    So when a teacher retires, when
12   do you eventually post these jobs?
13              MR. REITER:   Objection.
14        A.    When a teacher retires, their
15   position become available after their
16   retirement date, and it is reflected on the
17   DOE system.
18        Q.    Around what time is this
19   usually?
20        A.    Depends on the date they choose
21   to retire.   So people choose to retire when
22   people decide they want to retire.   They
23   decide a retirement date, and they file the
24   application of retirement with the required
25   DOE unit.   And, when the unit processes
```

```
 1                    R.  MILLS
 2   their transactions, the retirement date.
 3   And, that's the only time we can make their
 4   jobs available.
 5         Q.      Okay.  So in 2015, how many
 6   full-time teachers retired at the end of
 7   the school year?
 8         A.      I could not tell you that
 9   number.
10         Q.      Okay.  Were there any that you
11   recall?
12         A.      I assume.  People every year,
13   we have somebody, but to tell you the
14   number and who retired, I could not tell
15   you that off the top of my head.
16         Q.      Could you tell me an
17   approximate?
18         A.      I can't.  It varies from year
19   to year.
20         Q.      Okay.  Were you aware that the
21   full-time jobs of the retired teachers were
22   not available as of June 29th, 2015 at the
23   placement center?
24               MR. REITER:  Objection.
25         A.      I'm aware that all jobs of
```

```
 1                    R.  MILLS
 2   people who had retired, were available.
 3   Everyone who had retired by June 29th,
 4   their jobs were available at the placement
 5   center.
 6         Q.     By that logic, Ms. Wald could
 7   have applied to these jobs, correct?
 8         A.     Yes.  Everything was there.
 9         Q.     Were you aware that Ms. Wald
10   could not apply to jobs of retired
11   full-time teachers because they were not
12   posted as of June 29th, 2015?
13                MR. REITER:   Objection.
14         A.     I'm not aware of that.  I'm
15   aware that all the jobs of people who
16   retired at that time, was available in the
17   directory of classes.  And, was available
18   to everyone who came to the hiring hall.
19         Q.     Okay.  Is it obligatory for a
20   teacher to come to the placement center?
21         A.     It's obligatory if the
22   teacher's class was closed.  If any part of
23   the class was closed.
24         Q.     Okay.
25         A.     Those are the only people who
```

```
 1                    R.  MILLS
 2   are obligated to come.
 3          Q.     Where is that policy?
 4          A.     I'm not sure of your question.
 5          Q.     Sure.  I'm asking regarding the
 6   policy about teachers having to go to the
 7   placement center.  Is there a policy
 8   regarding that?
 9          A.     It's a longstanding agreement
10   between the UFT, and the Department of
11   Education.
12          Q.     Who has priority over the jobs
13   at the placement center?
14          A.     Teachers are seen in seniority
15   order.  And, in terms of their license.  So
16   the first person who is the most senior
17   teacher who shows up.  And, it goes in
18   seniority order.  So priority is based on
19   seniority.
20          Q.     Has there been any changes in
21   the job placement center since 2015?
22               MR. REITER:  Objection.
23          A.     Not that I know of, no.
24          Q.     Are you aware of any negative
25   press mentioned to you in the past three
```

```
 1                    R.  MILLS
 2     years?
 3          A.     Lots.
 4          Q.     Like what?  Tell me about it.
 5          A.     I can't -- I don't remember the
 6     details.
 7          Q.     I understand.  Tell me what you
 8     remember.
 9          A.     I know.  Let me see.  I know
10     there have been complaints about adult ed
11     by retired teachers complaining about adult
12     ed.
13          Q.     What are their complaints
14     about?
15          A.     The program has changed, the
16     program is not running well.  They say we
17     don't have books.  Things like that.
18          Q.     What newspapers do you recall
19     cover these stories?
20          A.     Most likely the Post.
21          Q.     Any other newspapers that you
22     recall?
23          A.     I think that's it.  I don't
24     know.  I don't really pay that mind.  So I
25     don't keep tabs of that.
```

```
 1                    R.  MILLS
 2          Q.      What about any individual
 3    teachers complaining about you to the
 4    press?  Do you have any recollection or
 5    knowledge?
 6          A.      Retired teachers.
 7          Q.      Do you have their names?
 8          A.      I don't recall who they are.
 9    Most of the things sometimes they say
10    anonymous.  I know that the DOE got a lot
11    of anonymous complaints.
12          Q.      What about current DOE
13    employees?  Any complaint that you know of
14    about?
15          A.      I know that an education
16    administrator complained about her
17    discontinuation.
18          Q.      What was her name?
19          A.      Luckisha Amankwah.
20          Q.      Did she complain about you?
21          A.      Oh, yes.
22          Q.      What did she say?
23          A.      She said I wrote her up, and
24    demoted her.
25          Q.      How many stories has the Post
```

```
 1                    R. MILLS
 2   written against you?  Do you know?
 3        A.    I don't know.
 4        Q.    Is it more than five, less than
 5   five?
 6        A.    I don't know.
 7              MS. KAPITONOVA:  Let's take
 8         five minutes.
 9              (Whereupon a short break was
10         taken.)
11        Q.    Did Ms. Wald ever request a
12   more compressed schedule?
13        A.    Can you clarify what you mean
14   by more compressed.
15        Q.    Did she ever request a schedule
16   with her hours are more close together to
17   each other?
18        A.    My understanding is she
19   requested something closer to work.  Closer
20   to home I should say.
21        Q.    Okay.  Who requested this?
22        A.    That's what was shared with me
23   by the accommodation unit, Mr. Brewton.
24   Told me she was requesting something closer
25   to home.
```

```
 1                    R.  MILLS
 2        Q.     Did anyone else besides Mr.
 3   Brewton told you about this accommodation
 4   request?
 5        A.     No.
 6        Q.     Okay.  Did anyone besides Mr.
 7   Brewton ever request a more compressed
 8   schedule, or any schedule change on behalf
 9   of Ms. Wald?
10               MR. REITER:   Objection.
11        A.     No.
12        Q.     Are you currently under any
13   investigation by the Department of
14   Education?
15        A.     I wouldn't know that.  Those
16   are confidential.  I don't know.
17        Q.     Have you ever been involved in
18   any investigation in the past by the
19   Department of Education?
20        A.     Sure.
21        Q.     How many times would you say?
22        A.     I don't know.
23        Q.     Can you give me an approximate?
24        A.     No.
25        Q.     Okay.  What was the outcome of
```

1                          R.  MILLS

2    those investigations?

3          A.      Not founded.   Unfounded, or not

4    substantiated.   I think that was the word.

5          Q.      Do you know what were the

6    allegations against you about?

7          A.      We don't have textbooks, um, we

8    don't have materials.

9          Q.      Anything else?

10         A.      Those are the things I can

11   recall.   We purchase furniture.

12         Q.      What about your performance?

13   Anything about that?

14         A.      Nothing about my performance.

15         Q.      What about your decisions?

16   Anything about that?

17         A.      Nothing investigated that I'm

18   aware of.

19         Q.      What about your treatment to

20   other employees of the Department of

21   Education?

22                MR. REITER:   Objection.

23         A.      Not that I was interviewed or

24   asked anything about that.

25         Q.      All right.   I have no further

1                          R.  MILLS

2      questions.   Thank you so much.

3

4            A.      Thank you.

5                    (Whereupon, at 12:21 P.M., the

6            Examination of this Witness was

7            concluded.)

8                    o          o          o          o

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        R. MILLS
 2                  D E C L A R A T I O N
 3
 4          I hereby certify that having been
 5     first duly sworn to testify to the truth, I
 6     gave the above testimony.
 7
 8          I FURTHER CERTIFY that the foregoing
 9     transcript is a true and correct transcript
10     of the testimony given by me at the time
11     and place specified hereinbefore.
12
13
14
15                      _____
                             ROSE-MARIE MILLS
16
17
18     Subscribed and sworn to before me
19     this _____ day of _____ 20___.
20
21
22          _____
                 NOTARY PUBLIC
23
24
25
```

```
 1                    R. MILLS
 2              E X H I B I T S
 3
 4   PLAINTIFF EXHIBITS
 5
 6   EXHIBIT    EXHIBIT                    PAGE
 7   NUMBER     DESCRIPTION
 8   1          Complaint                  26
 9   2          Accommodation request form 31
10   3          Schedule                   38
11   4          Response                   59
12
13      (Exhibits retained by Counsel.)
14
15              I N D E X
16
17   EXAMINATION BY                        PAGE
18   MS. KAPITONOVA                        4
19
20
21
22
23
24
25
```

```
 1                    R. MILLS
 2            C E R T I F I C A T E
 3
 4    STATE OF NEW YORK )
                        :  SS.:
 5    COUNTY OF RICHMOND )
 6
 7         I, ERIKA OLSSON, a Notary Public for
 8    and within the State of New York, do hereby
 9    certify:
10         That the witness whose examination is
11    hereinbefore set forth was duly sworn and
12    that such examination is a true record of
13    the testimony given by that witness.
14         I further certify that I am not
15    related to any of the parties to this
16    action by blood or by marriage and that I
17    am in no way interested in the outcome of
18    this matter.
19         IN WITNESS WHEREOF, I have hereunto
20    set my hand this 26th day of April 2018.
21
22
23              _____
                    ERIKA OLSSON
24
25
```